MARY ZIRNGIBL *et al.*

*v.*

CALUMET AND CHICAGO CANAL AND DOCK COMPANY *et al.*

*Filed at Ottawa October 29, 1894—Rehearing denied October 30, 1895.*

1. REAL ESTATE—*title from government draws possession to it.* One holding title to lands derived from the United States is, by force thereof, in possession until there is an ouster or disseizin.

2. SAME—*presumptions arising from government title.* Title from the general government being shown, presumptions in favor of its validity, and of legal possession under such title, arise, and remain until overcome by evidence to the contrary.

3. SAME—*presumption upon proof of deed of land by unidentified party.* A grantor wholly unidentified, who is shown by parol to have made a deed which was lost, will be presumed to have been a stranger to the title.

4. ADVERSE POSSESSION—*what are the requisites to constitute a bar.* Adverse possession, to constitute a bar against the legal title, must be (1) hostile or adverse, (2) actual, (3) visible, notorious and exclusive, (4) continuous, and (5) under a claim or color of title.

5. SAME—*cannot be made out by inference or implication.* The presumptions all being in favor of the true owner, adverse possession cannot be made out by inference or implication, and the proof to establish it must be strict, clear, positive and unequivocal.

6. SAME—*possession of part without color of title to the whole—effect.* While possession of part of a tract under color of title to the whole is, in law, possession of all described in the deed, possession of a few feet of ground by a grave and a fence around it, in a small strip of land in general use as a burial place, while sufficient to establish title to the grave, will not draw to it title by prescription to the tract wherein such grave and burying place are located.

7. SAME—*when good only to extent of hostile occupancy.* To the extent that the hostile occupancy would not afford one possessing the true title notice or put him upon inquiry, such possession does not operate upon the owner's right.

8. SAME—*possession by bailiff for owner and adverse claimant jointly—effect.* One in possession of land as bailiff for both an adverse claimant and the title owner, jointly, will, under the legal presumptions, be deemed to hold the possession for the title owner.

APPEAL from the Circuit Court of Cook county; the Hon. O. H. HORTON, Judge, presiding.

EDWARD ROBY, for appellants:

Twenty years' adverse possession of the land is conclusive evidence of title in fee.  *Schoonmaker* v. *Doolittle,* 118 Ill. 608 ; *Riverside Co.* v. *Townshend,* 120 id. 20 ; *McDuffee* v. *Sinnott,* 119 id. 449 ; *Gage* v. *Hampton,* 127 id. 87; *Bicknell* v. *Comstock,* 113 U. S. 150.

One method of occupation may be more satisfactory than another as evidence of exclusive possession; but there is no rule of law that a title by adverse possession can only be gained by certain particular methods of occupation. (*Eastern Railroad Co.* v. *Allen,* 135 Mass. 13.) Each case must, from sheer necessity, be determined from its own peculiar circumstances, (*Webb* v. *Richardson,* 42 Vt. 465,) for the essential particular facts are as various as the nature and locality of real property, or the purposes for which it is adapted or to which the owner or claimant may choose to apply it.  *Clancy* v. *Houdlette,* 39 Me. 451; *Ewing* v. *Burnett,* 11 Pet. 41.

The possession of a wild island in the Ohio, subject to overflow, so that fences and buildings could not be kept on it, was held to be shown by exclusive use by annual pasturage.  *Webb* v. *Hynes,* 9 B. Mon. 388.

Inclosure is but one act indicating possession and claim of ownership.  The possession must be by acts suitable to the character of the land, and being such, it matters not what its purpose.  *Bell* v. *Denson,* 56 Ala. 444; *Bowen* v. *Guild,* 130 Mass. 123.

When the lands are low bottom lands on a river, so subject to overflow as to be unfit for cultivation, and incapable of use except to raise grass and hay on them, the use of them for the only purpose for which they are fitted or capable, by constantly cutting the hay on them for twenty years, will be sufficient, and will constitute adverse possession.  *Merril* v. *Tobin,* 30 Fed. Rep. 738.

Where, under color of title, a person puts upon the land a substantial, visible enclosure, that is decisive proof

of disseizin of adverse title. *Cantagrel* v. *Von Lupin*, 58 Tex. 577.

Fencing and continued use of the land as pasture is sufficient possession. *Cantagrel* v. *Von Lupin*, 58 Tex. 570.

The fence of Zirngibl, as maintained by his children, was, with the lake and river, a substantial and sufficient enclosure of the land. *Jackson* v. *Halstead*, 5 Cow. 216; *Trustees* v. *Kirk*, 84 N. Y. 220.

Where the person enters under a claim and color of title he is to be regarded with more favor than a mere naked disseizor, and as entitled to all the land within the limits prescribed by the instrument under which he claims. *Whitehead* v. *Foley*, 28 Tex. 284; Angell on Limitations, chap. 31, and cases cited.

Monika Zirngibl was guardian in socage of her children, and as such had a right to the possession of the land, might avow in her own name, and could appoint Degnan to take charge and care of the land as bailiff of all the heirs. *Byrne* v. *Van Hoesen*, 5 Johns. 66.

The possession or control of the mother was that of guardian in socage, and was a sufficient seizin of the land by the children. *Doe* v. *Keen*, 7 Term. Rep. 386; *Goodtelle* v. *Newman*, 3 Wils. 516.

The possession of the tenant in subordination to the title of the landlord continues, notwithstanding any claim by the tenant or his successors of a hostile title. *Whiting* v. *Edmunds*, 94 N. Y. 314; *Jackson* v. *Davis*, 5 Cow. 129.

All who succeed to the possession of the tenant are tenants of the first landlord. *Fusselman* v. *Worthington*, 14 Ill. 135; *Cox* v. *Cunningham*, 77 id. 545; *Doty* v. *Burdick*, 83 id. 473.

There cannot be a concurrent seizin of lands. 1 Washburn on Real Prop. chap. 2, sec. 76, p. 63.

If a seizin by one be proved or admitted it will be presumed to continue till the contrary is shown. 1 Washburn on Real Prop. chap. 2, sec. 77, p. 63.

No one who has a seizin and title to land will lose his seizin by any entry by a stranger, so long as he retains his possession. 1 Washburn on Real Prop. chap. 2, sec. 77, p. 63; 1 Salk. 246; Littleton, sec. 701; 1 Coke's Inst. 868.

Possession must be surrendered to the landlord before adverse rights can be asserted    *Doty* v. *Burdick*, 83 Ill. 473; *Brown* v. *Keller*, 32 id. 151.

The mere intrusion of a trespasser is not an interruption of the possession of one holding adverse possession under color of title. *Ballard* v. *Hansen*, 33 Neb. 861; *Bell* v. *Denson*, 56 Ala. 444; *Rayner* v. *Lee*, 20 Mich. 384; *Hughes* v. *Pickering*, 14 Pa. 297; *Hodgins* v. *Crow*, 32 Ga. 367; *Fugate* v. *Pierce*, 49 Mo. 441; *Stettnische* v. *Lamb*, 18 Neb. 619; Am. & Eng. Ency. of Law, 274; *Crispin* v. *Hamravan*, 50 Mo. 536; *Harper* v. *Tapley*, 35 Miss. 506; *De LaVega* v. *Butler*, 47 Tex. 529.

It was the common law that entry and possession of part of a tract of land, under color of title to the whole tract, was entry and possession of the whole land comprised in the deed. (2 Blackstone's Com. 312, 315.) This common law has been asserted and applied in this State from an early day. *Hassett* v. *Ridgely*, 49 Ill. 204; *Fairman* v. *Beal*, 14 id. 244; *Williams* v. *Ballance*, 23 id. 193; *Wettig* v. *Bowman*, 39 id. 416; *Hardisty* v. *Glenn*, 32 id. 62; *Prettyman* v. *Wilkey*, 19 id. 235; *Winkler* v. *Meister*, 40 id. 349; *McLean* v. *Farden*, 61 id. 106; *Barger* v. *Hobbs*, 67 id. 592; *Huftalin* v. *Misner*, 70 id. 205; *Austin* v. *Rust*, 73 id. 491; *Lancey* v. *Brock*, 110 id. 609; *Fisher* v. *Bennehoff*, 121 id. 426.

PECKHAM & BROWN, and JOHN B. COHRS, for appellees.

Mr. JUSTICE BAKER delivered the opinion of the court :

The land here in controversy is that piece or parcel of land in Cook county bounded as follows : Beginning at the shore of Lake Michigan, at the end of the old fence, at or about where the line between the north-west quar-

ter and the south-west quarter of section 5, south of the
Indian boundary line, in township 37 north, range 15, east
of third principal meridian, intersects the shore of Lake
Michigan; thence on a course somewhat south of west,
and following the line of said old fence with its bends
and courses, to the point of its intersection with the Cal-
umet river above said quarter section line; thence down
said river, and following the meanderings thereof, to
Lake Michigan, and thence along said Lake Michigan to
the place of beginning, containing forty acres, more or
less, and comprising therein all the north-west fractional
quarter of said section 5 and all the north-east quarter of
section 6, in said township and range, which lies east of
the Calumet river.

On January 25, 1882, the Calumet and Chicago Canal
and Dock Company, by deed of that date, assumed to con-
vey to Horace A. W. Tabor, of Denver, Colorado, an undi-
vided one twenty-fifth part of said north-west fractional
quarter of section 5, and also an undivided one twenty-
fifth part of certain premises in the north-east quarter of
section 6, in said township and range, and which said
latter premises include all of said north-east quarter of
section 6 that lies east of the Calumet river.  On the same
day Tabor exhibited in the circuit court of the United
States for the Northern District of Illinois a bill in chan-
cery for partition of all of said lands.   The Calumet and
Chicago Canal and Dock Company, August Magaritz,
Martin Behn, William Behn, Martin Behn, Jr., August
Heinke, Louis Hausler, Martin Hausler, and fourteen other
persons, were made parties defendant.   The allegations
of the bill were, in substance, that Tabor, complainant,
was owner in fee simple of an undivided one twenty-fifth
part of the premises, and the Calumet and Chicago Canal
and Dock Company the owner in fee simple of the other
undivided twenty-four twenty-fifths of said land, and
that the other defendants claimed to have some interest
in the whole or some part of said lands.   The Calumet

and Chicago Canal and Dock Company answered, admitting the allegations of the bill, and denying that the other named defendants had any interest whatever in the premises.   August Magaritz answered, and described a parcel of said land 408 feet by 568 feet in size, and said he was in possession thereof and claimed title thereto in fee simple absolute, and that he derived title from the heirs of John B. Jackson, deceased, and by possession and payment of taxes for more than twelve years then last past. Martin Behn and William Behn answered, and described a parcel 304 feet by 216 feet in size, and said that they were jointly in possession thereof, and claimed to be joint owners in fee simple absolute, and said that they acquired title thereto by occupancy and the payment of taxes for upwards of twenty-one years; and they further answered, and described another parcel 472 feet by 384 feet in size, and said that they jointly possessed and occupied the same, and claimed to own the same jointly, in fee simple absolute, and said that they acquired title thereto by actual occupancy and payment of taxes for upwards of nineteen years then last past.   And Louis Hausler and Martin Hausler answered, and described a parcel containing about four and three-tenths acres, and said that they jointly occupied and possessed the same and claimed to jointly own the same in fee simple absolute, and said that they acquired title thereto by deed from William B. Crosby, and by occupancy and the payment of taxes for upwards of sixteen years.

Replications were filed to the answers, and the cause was referred to the master in chancery to take and report the proofs, with his findings thereon.   The testimony was in part taken.   The deed from the heirs of John B. Jackson, deceased, was not exhibited.   The quit-claim deed from one William B. Crosby was not connected with either the government title or with possession.   It was not shown that the defendants, or any or either of them, had ever paid any taxes on the land or any portion of it.

On the other hand, Tabor and the Calumet and Chicago Canal and Dock Company introduced evidence which was supposed to show that the patent title from the government was vested in them, and also introduced written leases taken by Magaritz and the Behns and the Hauslers, defendants in said partition suit, from the Calumet and Chicago Canal and Dock Company, and proof that for several years they paid the rents called for by said leases.

C. M. Hardy was solicitor in the partition suit for the defendants other than the canal and dock company. He afterwards withdrew from the case. Then Charles W. Colehour became their counsel. He was a lawyer and a speculator in real estate. He says in his answer filed in the present suit, that "he then had, and perhaps still has, from reasons satisfactory to himself, a feeling of personal antagonism to the said Calumet and Chicago Canal and Dock Company." Be this as it may, he hunted up the Zirngibl family, and he induced Roby to appear for Magaritz and the Behns and the Hauslers in the Tabor partition suit.

The land that was sought to be partitioned in the Tabor suit, and that is in controversy in this litigation, is a point of land on the east side of the Calumet river that lies between that river and Lake Michigan. The most of it, in early days, was low and wet and swampy. A portion of it, however, was higher than the adjoining lands, and was used, in early days, as a burying ground. One witness testifies that there were three hundred graves there, another that there were two hundred, and a third that there were at least sixty. Several of the graves were fenced in. One of the graves, around which there was a fence, was also provided with a gravestone. Upon this gravestone were certain words in the German language, which being translated into the English language are: "Here rests in God the Lord the well-born Andreas Zirngibl, born March 30, 1797, died August 21, 1855."

The Zirngibl family did not hunt up the forty acres of land here in question, although its value had so increased during the years that Andreas Zirngibl had been buried there, as that it was estimated to be worth a million dollars.    On the contrary, as already stated, Colehour searched diligently for the family and found them in Chicago.    The result was, that on August 16, 1887, George A. Zirngibl, Franz X. Zirngibl, Henry Zirngibl and Theresa Barcal came into the Circuit Court of the United States, in the partition suit of Tabor, under and by virtue of section 14 of chapter 106 of the Revised Statutes of the State of Illinois, and filed an answer therein.    They stated in their answer, among other things, that Andreas Zirngibl died intestate on the 21st day of August, 1855, seized in fee of all of the land above described, and left him surviving Monika Zirngibl, his widow, and George A. Zirngibl, Franz X. Zirngibl, Theresa Zirngibl, (now Theresa Barcal,) and Henry Zirngibl, his heirs-at-law; that said respondents had at all times since the death of their father actually possessed all of said lands, claiming to own and actually owning them in fee simple absolute, and that by the Statute of Limitations the plaintiff, and the persons through whom he claims, are barred of all right to enter or bring suit for said lands, if any right they ever had.    It seems that in said partition suit the testimony of the Zirngibls and of various other persons was taken before the master in regard to the Zirngibl title, and the master made report to the court of the proofs, and his findings thereon, but it does not appear that the Federal Court ever rendered a decree in the cause or made final disposition of the case.

On August 12, 1887, which was some four days prior to the filing of the answer of the Zirngibls in the partition suit, George A. Zirngibl, Franz X. Zirngibl, Henry Zirngibl and Theresa Barcal filed in the Cook circuit court the bill of complaint upon which the litigation now before us is based, and they made the Calumet and Chi-

cago Canal and Dock Company, Horace A. W. Tabor, Charles W. Colehour, Douglas S. Taylor, Louis Hausler, Martin Hausler, Martin Behn, Sr., Martin Behn, Jr., Wilhelm Behn, August Heinke and Frederick Meirendorf parties defendant thereto. The bill is a bill to quiet title, and for an injunction, and for certain relief against said Colehour. Thereafter, on January 25, 1889, Anna Zirngibl, (widow of Jacob Zirngibl, deceased, a son of Andreas Zirngibl, deceased,) and Anna Zirngibl the second, Jacob Zirngibl, Isabella Zirngibl and Antoinette Zirngibl, infant children of said Jacob Zirngibl, deceased, by their guardian and next friend, presented their intervening petition, and prayed to be let into the suit as co-plaintiffs in the bill of complaint, and on the same day an order was entered allowing the petition and the motion of the other complainants in that behalf made, and amending the bill so as to join as co-plaintiffs therein the persons last above named. All of the defendants answered the bill, and replications were filed to such answers.

On July 18, 1890, the Calumet and Chicago Canal and Dock Company and Horace A. W. Tabor exhibited in the court their cross-bill, the objects of which were to quiet their title and restrain by injunction the commission of trespasses upon the lands and premises involved in the controversy. All the other parties complainant and all the other parties defendant in the original bill were made defendants to this cross-bill, and August Magaritz, Edward Roby and Monika Zirngibl, widow of Andreas Zirngibl, deceased, were also joined as defendants thereto. August Magaritz made default upon the cross-bill, and the same was taken as confessed as against him, and various others of the defendants made like default, and decrees *pro confesso* as to them were entered in respect to said cross-bill. The adult members of the Zirngibl family filed a joint and several answer to the cross-bill, and the infant defendants answered by their *guardian ad litem.*

There were also replications to these answers.  Afterward the cause was submitted to the chancellor upon the pleadings and proofs, and a decree was rendered dismissing out of court, for want of equity, the original and amended bills of the Zirngibls, and granting relief, as prayed for, upon the cross-bill of the Calumet and Chicago Canal and Dock Company and Horace A. W. Tabor, as against the Zirngibls and the other defendants to the cross-bill, and awarding a writ of assistance against August Magaritz.  The Zirngibls and Edward Roby thereupon prosecuted this appeal, and after the docketing of the case in this court it was suggested that George A. Zirngibl died February 20, 1893, intestate, leaving him surviving Mary Zirngibl, his widow, and Mary C. Scherer, George F. Zirngibl and John L. Zirngibl his children and only heirs-at-law, and such proceedings were here had as that said named persons were substituted as appellants in the place of the appellant George A. Zirngibl, deceased.

The claim of appellants is substantially as follows: Andreas Zirngibl was a fisherman, and had the exclusive right of fishery in some two miles of the river Danube, in Bavaria.  He emigrated from Germany, and arrived in Chicago in July, 1854, and lived on the north side in that city for some five or six months.  His family consisted of his wife, Monika Zirngibl, four sons and a daughter, to-wit: Franz X., sixteen years of age; Jacob, fourteen; George, twelve; Theresa, nine, and Henry, six.  He did some fishing on the north branch of the Chicago river and in Lake Michigan.  On Christmas, 1854, to follow the business which he knew, that of fishing, Andreas Zirngibl moved with his family into the woods in Indiana, close by Lake Michigan, near a station on the Michigan Southern railroad known as Whiting, where an acquaintance from Germany named Bindel had settled, who told him he would sell him some land if he would build a house on it.  This was about four and a half miles south-east from the mouth of the Calumet river.  Zirngibl had but

one arm. In a short time the family put up a log house on the land of their German acquaintance, Bindel. As soon as the ice permitted, Zirngibl and his sons fished with a seine in Lake Michigan, sometimes sending their fish in by a neighbor named German, and sometimes sailing with them to Chicago, their home being about fourteen miles' sail from the mouth of the Chicago river. The boats required for carrying and casting a seine are very heavy, and the one-armed man and his boys found great difficulty in beaching their boat and carrying it far enough up onto the shore to be safe from the north-east storms of early spring, and he sought to find a place where they might row into a harbor and tie the boat, without being obliged to drag it from the water for safety. Such a place appeared at the mouth of the Calumet river. Zirngibl had brought with him considerable money from Germany, of which he had left upwards of $400 or $500. In the spring of 1855, east of the mouth of the Calumet river,—about a mile from the mouth and the nearest neighbor to it,—lived an Irishman known as "Irish Frank," or Frank Degnan or Dagnan. There was also around that country a man known as "Dutch Charley," or "Dutch John," who was much with Frank Degnan. On the west side of the Calumet river there was a water tank on the Michigan Southern railroad, and a station called Ainsworth, and a settlement of about seven houses, most of the residents being section-men or laborers on the railroad. There was a post-office and justice's office, the postmaster and justice of the peace being Corydon F. Stewart. Squire Stewart was also the town assessor of the town. Negotiations were had by Zirngibl, through "Dutch Charley" or "Dutch John," for the purchase of the land at the mouth of the Calumet river from some person whose name is unknown and who is not otherwise identified. The transaction was concluded in the office of the justice of the peace, which was also the post-office The deed was drawn by the justice of the peace and was exe-

cuted by the vendor; and the parties met at the office of
the justice of the peace, and Zirngibl paid the purchase
price, $160 in gold, upon the table of the justice, to the
vendor, in the presence of the justice and of his wife, and
of one or two of Zirngibl's children, and of Frank Deg-
nan, and "Dutch Charley" or "Dutch John," as the name
may be.   After the execution and delivery of the deed
and payment of the money the vendor went with Zirngibl
to point out and deliver the land to him.   He accom-
panied Zirngibl and Degnan and "Dutch Charley" and
Jacob and George Zirngibl to the adjacent bayou or
slough, where Franz Zirngibl was awaiting them with
the large fishing boat, and the boys took them in the boat
out through the slough and across the river to the land
sold.   He there pointed out the boundary, the river and
Lake Michigan forming two sides, and he proceeded to
point out particularly the other side, from the shore of
Lake Michigan, at a point about 125 feet or eight rods
north of the quarter line of section 5, thence west through
the slough to the west side of it.   Zirngibl having an ax,
the vendor chopped out part of the line, and directed
chopping the line through as he pointed out to Zirngibl,
marking it also with stakes and blazes upon the trees.
From the point where they reached the first high ground
he pointed out to them the course about south-west, which
soon entered a slough of considerable depth of water,
through which the sons chopped out the line as the vendor
designated it, marking it by stakes and chopping on the
trees, until they reached the Calumet river.   Thus the
vendor established the boundary by monuments, and de-
livered the possession of the land, which was wild land, to
Andreas Zirngibl, the vendee.   The deed was burned in
the great Chicago fire of October 8 and 9, 1871.   It, how-
ever, was recorded shortly after its execution and deliv-
ery, but the record of it was also destroyed in the same
fire.   As already stated, no one remembers the name of
the grantor, nor does any one remember the description

that was contained in the deed of the land conveyed
by it.

The claim of the appellants further is, that thereupon
Andreas Zirngibl immediately built, with the assistance
of his sons, a fence from the river to the lake, enclosing
the land in controversy; that two months thereafter he
died, and was buried on this land, and that his burial
took place there because he claimed that it was his own
land; that during these two months he also built a shanty
on this land, and although the family did not live in it,
he and his two sons, Franz and George, slept there, at
least frequently, and fished from there; that in 1856 the
whole family, who lived a few miles south of the land in
question, moved away from that part of the country alto-
gether, coming to Chicago to live; that before going,
Monika Zirngibl showed the land to Frank Degnan, and
told him to watch it, and that she would give him land
or money for so doing when she was able; that after-
wards she told August Magaritz—say about 1875 or 1876
—to watch the land, and promised that if he would keep
up the fence and repair the shanty he could live there
undisturbed, and finally be given "some land or some-
thing" for his trouble; that either Frank Degnan or Aug-
ust Magaritz, or both of them, have been there all the
time watching the land, and in possession of it for "the
Zirngibl heirs;" that since 1855 to the present time, Monika
Zirngibl, the widow, has visited the place a dozen times,
her husband's grave being there; that during the same
time Franz Zirngibl went out to the same land several
times every year, except for five years from 1861 to 1866,
when he was out of the city; that on those occasions he
looked around and went to see Frank Degnan, and some-
times made repairs on the "fence;" that in 1868 or 1869,
he, Franz Zirngibl, had Degnan nail up in a tree a sign
he made himself: "No trespassing on this ground.—Orders
by Zirngibl Bros.;" that this board was found by Magaritz,
some time in 1873, split in two pieces and lying at the foot

of a tree; that he could not read it, and "thought somebody was buried there," and it was by him kept in his house and brought to Mr. Roby in 1886; that this board, while up, could be seen by passers-by, and was seen after it was put up, several times, by Jacob Barcal, (Theresa Zirngibl's husband,) who was there "almost every year;" that George Zirngibl went out, from 1857 to 1861, from five to fifteen. times a summer, and frequently repaired "the fence;" that after 1861 he went two or three times a year—once every year at least—looking after "the fence;" that from 1855 to 1887 the land, or large and important parts of it, was occupied by other persons than the appellants, but under these circumstances:   First, Frank Degnan was allowed by them, in consideration that he would look out for the fence and for the grave, and pay taxes or anything there was to pay, "to cut the grass or anything he wanted inside;" that in 1870 or 1871 Frank Degnan told Franz Zirngibl that he had some good Dutch friends who wanted to build in there, and Franz Zirngibl told him it was all right; that in this way the Hauslers came to build there; that in 1872 Magaritz got permission from Frank Degnan to build on the land, and in 1873 saw Franz Zirngibl, who confirmed Degnan's permission; that in 1875 Degnan moved away, and appellants installed Magaritz in his stead; that the Behns, and Jarmer, and Meirendorf, and Heinke, and Drogmund, etc., all came to the land by permission of Degnan or Magaritz, and therefore all these people,—the Hauslers, Behns, Magaritz, Meirendorf and Heinke,—made defendants to this bill, were *quasi* tenants of the appellants; that although paying no money these various "tenants" made a sort of tribute to these appellants as landlords, by giving Franz and George, when they went out there, fish, fowl and dairy products.

We may here remark, by way of premise, that the record, as we understand it, shows that the patent or government title to the lands in controversy, to the extent of

the entire interest in that part of it that is in section 6, and to the extent of fifteen-sixteenths of that part of it that is located in section 5, is vested in the canal and dock company, and in Tabor, its grantee, and that the remaining one-sixteenth of the patent title to the land in section 5 seems to be vested in the executors of E. K. Hubbard. Appellants point out very many objections to the various links in the chain of title. They are too numerous to specify and consider in detail within the reasonable limits of an opinion. Some of them are extremely technical—too much so to be regarded as of weight in the administration of justice. Some of them are simply trivial. Others of them are based on what we cannot but regard as perversions of the record. None of them impress us as having merit in them.

It is well settled law that title to lands derived from the United States draws the seizin or legal possession to it, so that one who has such title, is, by force thereof, in possession until there is an ouster or disseizin. A title being exhibited that is deduced from the general government, the presumptions must be in favor of its validity, and in favor of legal possession under it, until such presumptions are overcome by evidence to the contrary. Assuming, then, that a deed for the point of land in litigation was executed and delivered to Andreas Zirngibl, as is claimed, the presumption must be that the grantor therein, he not being named or identified, was a stranger to the true title, and there is, therefore, no ground in this case upon which to base a claim that the government, paramount or superior title is shown to be in appellants, or any or either of them. Nor do we find any evidence in this record that fairly tends to show, or raises any implication, that either Andreas Zirngibl, or any person or persons holding or claiming under him, ever or in any way, either directly or indirectly, paid any taxes upon the lands, or any portion of them. It would seem that if appellants have any footing in the case it must be

under the twenty years limitation law, and by virtue of twenty years' adverse possession.

Two questions may properly be here considered. Was a deed of the premises actually signed, sealed and delivered to Andreas Zirngibl? We are inclined, although not without a considerable degree of hesitation, to answer this question in the affirmative. We concede that it would be unreasonable, and especially so after the expiration of more than thirty-two years after the date of the supposed transaction, to expect appellees to prove a negative,—and that, too, in regard to a matter to which they were strangers. And it is also true that six of the witnesses who gave testimony to establish the purchase and deed were interested parties, that two of the remaining four were old and intimate friends of the Zirngibl family, and that the other two were very old people, who were hunted up down in Logan county, and whose testimony there was opportunity to influence. Still, in our opinion there is no sufficient ground for disregarding the whole of the testimony of these ten witnesses, and thereby reaching the conclusion that no purchase was in fact made or deed executed and delivered. Stewart testifies: "This piece of land that this one-armed fisherman bought was a piece of land lying between the river and the lake, on the point on the other side of the river. I do not recollect how much he purchased." And Mrs. Stewart testifies: "I understood that he was buying forty acres at the mouth of the river. It came down between the river and the lake. It ran into that point across the river from where we lived. We lived on the west side of the river, and the land he bought ran up to where the Michigan Southern railroad now is." We will take this, when considered in connection with the other evidence, as a sufficient description, for the purposes of this decision, of the premises embraced in the deed.

Was the deed ever recorded? We do not believe that it was. The witnesses to prove the recording are Louis

Bopp, Franz X. Zirngibl and George A. Zirngibl. Bopp says that in 1855 he was tending bar for Wyman & Wagner at 49 LaSalle street; that Andreas Zirngibl "came in several times,—once or twice a week in the place; and he came in there once and told Mr. Wyman that he had bought a piece of property, and showed him the deed. I know something about what he did with that deed. I knew Mr. William Peltzer. He was making out citizens' papers in the court house. I went over with Mr. Zirngibl and showed him Mr. Peltzer,—William Peltzer,—and he handed him the deed, and we went off again. He handed him the deed to get it recorded. I afterwards saw that deed, something like two or three or four weeks afterwards. Zirngibl had it at that time." It seems to us almost or quite incredible that Bopp should, under the circumstances, remember the details of this transaction. Franz X. Zirngibl testifies that he went with his father to a boarding house on Dearborn street, kept by one Stadleman, and his father there got a man called Joe, who did the cleaning out, etc., around the house, to go along with him and show him the place in the court house where he was to take the deed for record, and that he, himself, did not go along with them. The glaring inconsistency between this testimony and that of Bopp is apparent. George A. Zirngibl, on his direct examination, testifies that his father went with him and his brother to Chicago, and "took that deed—that very paper," and adds, "he came along with us, and brought it here to the court house, and it was here all of three weeks." And on his cross-examination he says: "I did not go to the court house with my father. We were selling fish." It thus appears that the testimony of George is inconsistent with itself, as well as with that which is testified to by either his brother or Bopp, in regard to the same matter. And we may here add, that we are unable to place any reliance whatever in the testimony of George in regard to the transactions connected with

the purchase and deed and occupation of the land in 1855. He gives page after page, and to the extent of very many pages, of minute details of conversations and proceedings then had.   We simply do not believe that it is possible that a boy of twelve years of age could have remembered for a third of a century these details, many of them having reference to matters with which he must have been wholly unfamiliar.   We fear that his cupidity has unduly jogged his memory.   On the other hand, the tract indexes of Shortall & Hoard and those of Chase Brothers, and the nominal indexes of Jones & Sellers, almost conclusively show that no conveyance to any person of the name of Zirngibl of any land in the northwest fractional quarter of section 5, township 37, range 15, south of the Indian boundary line, was ever at any time recorded from the formation of Cook county up to the year 1871, inclusive, and that no deed of any land made to a person of that name was recorded in said county prior to the year 1860.   We suppose that it is, of course, possible that by some means or other a conveyance might have been omitted from the indexes of one or another of these three distinct and independent firms of title examiners and abstract makers, but it seems almost or quite impossible that it could have been overlooked or omitted by all three firms.

The adverse possession which is required to constitute a bar to the assertion of a legal title by the owner of it must include these five elements :   It must be (1) hostile or adverse, (2) actual, (3) visible, notorious and exclusive, (4) continuous, and (5) under a claim or color of title. (1 Am. & Eng. Ency. of Law, p. 228, and cases cited in notes.)   In Wallace's note to *Nepeau* v. *Doe, etc.* 2 Smith's Lead. Cases, part 2, 707, it is said that the possession must be an actual, continued, visible, notorious, distinct and hostile possession.   Substantially the same doctrine has frequently been announced by this court.   *McClellan* v. *Kellogg,* 17 Ill. 498 ;   *Turney* v. *Chamberlain,* 15 id. 271 ;

*Weaver* v. *Wilson*, 48 id. 125; *Ambrose* v. *Raley*, 58 id. 506; *Lancey* v. *Brock*, 110 id. 609.

Adverse possession cannot be made out by inference or implication, for the presumptions are all in favor of the true owner, and the proof to establish it must be strict, clear, positive and unequivocal. *McClellan* v. *Kellogg, supra; Jackson* v. *Berner*, 48 Ill. 203; *Ambrose* v. *Raley, supra; Trustees of Schools* v. *Schroll*, 120 Ill. 509; authorities cited in note 2 to page 228, 1 Am. & Eng. Ency. of Law, *supra.*

In briefly considering the evidence in regard to the adverse possession of appellants and their ancestor, we will, to some extent, follow the plan pursued by counsel, and separately deal with the different phases in which that evidence presents itself.

*First*—We will first take up the matter of the sign board. As already stated, the testimony of Franz X. Zirngibl is, that in 1868 or 1869 he had Degnan nail up in a tree on the premises a board, on which was painted the device, "No trespassing on this ground.—Orders by Zirngibl Bros." The testimony of Barcal, his brother-in-law, is, that he saw the sign several times in 1873, or 1874, or 1868. The testimony of Magaritz is that he found it, in 1873, split in two pieces and lying at the bottom of a tree; that he took it home and put it under his bed, and kept it until he took it to Mr. Roby, in 1886. It appears from his testimony that he has an arrangement by which he is to get, if the Zirngibls win the suit, a portion of the land that he considers worth over $100,000. We agree with the chancellor who heard this cause that it is a most remarkable fact that a person who was at the time entirely disinterested should pick up the pieces of that sign and keep them under his bed for thirteen years. The evidence of Chase, a sign painter who had been engaged in that business in Chicago for forty-four years, and the evidence of Groves, a sign painter who had been engaged in that business in that city for thirty-two years,

both of whom were introduced as experts, shows, from the condition of the board and the paint, that the sign board had not been exposed to the weather and the open air for a period of as much as thirty days altogether. And as we understand the testimony, it also appears from the nail-holes in the board, and from the absence of other nail-holes, that the sign board had never been nailed to a tree.   We are forced to the conclusion that the testimony in regard to the sign board is manufactured evidence.   It cannot be otherwise than that the exposure of the fraud should throw discredit upon the claim made by appellants.

*Second*—Andreas Zirngibl died at Whiting, Indiana, in August, 1855.   He was buried on the point of land at the mouth of the Calumet river, several miles distant.   A child of John Mann, the patentee of the land, was buried there.   So was John B. Jackson, and also various members of the Culver, the Jackson and the Gaughan families, and also numerous other persons,—probably several hundred.   It was, in fact, in early days, used as a common burial ground.   Heinrich D. Eggers, who has lived at Whiting since 1849, and was seventy-three years old when his testimony was taken, says: "After Zirngibl died his boys asked me where they should go with him. I told them to go to Ainsworth.   They called it Ainsworth at that time.   It is South Chicago now.   To go to Mr. Culver there.   I knew he had a burying ground there.   I knew we had no burying ground there.   The boys did not know where to bury their father.   I told them they had better go down to Ainsworth—that there was a burying ground there.   I told them to go to Mr. Culver.   He was an old settler there.   He had the ferry boat, and had that business in his hands."   The members of the Zirngibl family swear that he was buried on the small strip of high ground at the mouth of the river because he wanted to be buried on his own ground.   Their testimony in that regard is corroborated by that of Johannes Ger-

man and Frederick Opperman. It appears that the so-called tombstone at his grave, upon which is painted the inscription hereinbefore mentioned, is not of stone, but a slab of white pine. It also appears that a few years after his death the grave was inclosed with a picket fence; that it had been so inclosed for twenty-nine years prior to the commencement of this suit, and that during that time the fence was kept in repair by the surviving members of his family, and both the slab and the fence occasionally painted by one of his sons, who was a painter. It would seem that this grave, and the lot fenced in by the fence constructed around it, were during all these twenty-nine years notoriously and exclusively occupied and adversely possessed by the widow and children of the deceased.

It is, of course, settled law that possession of part of a tract of land under color of title to the whole tract is possession of the whole tract described in the deed. But it can not be the law that the possession of a few feet of ground by a grave, and a fence around it, in a small strip of land in general use as a burial place, will draw to it a title, by prescription, to the forty acres of land in which the grave is located. A dwelling house or other building, however diminutive, or an enclosure even though small, if used or intended for ordinary purposes of life, may be sufficient to challenge attention, and suggest to the owner of the land the existence of an adverse claim, even extending to the entire tract of land. But a grave, even though it be protected by a fence around it, if located in a burial place, though such place is used only to a limited extent for general burial purposes, does not indicate or give notice of an appropriation or possession of more of the land than is within the enclosure. Such grave and fence do not operate as a disseizin and possession co-extensive with the whole tract of land. To be effective as a bar, the extent of the adverse possession must in some way be manifested to the owner. To the

extent that the hostile occupancy would not afford him notice or put him upon inquiry the possession does not operate on his right.

*Third*—We do not place the least faith or confidence in the story told by Franz X. Zirngibl and George A. Zirngibl of the livery of seizin that followed the purchase by their father. We do not believe that they immediately went with the unknown vendor, their father, Degnan and "Dutch Charley" to the land and chopped their way through the swamp, slough and water, on a crooked line, from Lake Michigan to a point on the Calumet river near the railroad bridge. Franz says: "That man walked ahead, and father took an ax and chopped the trees away." George says that the vendor "stood at Lake Michigan and pointed through," and "motioned left and right," "and Degnan, my brother Frank, my father, me, and this Charlie, we went along, and then we put in the stakes and chopped trees, and that was the line."

*Fourth*—There was for many years a fence reaching across from the shore of Lake Michigan to the Calumet river. It was constructed on what is now claimed to be the boundary line of the land of appellants. There was a gateway, with bars, at the road that led from the ferry over the river to the regions south and east. Many of the stumps of the fence-posts were still there at the time of the hearing. Thus the point of land in dispute was completely enclosed, the Calumet river and Lake Michigan forming two sides of the enclosure and the fence the other side. The contention of appellants is that this fence was built in 1855, immediately after his purchase, by Andreas Zirngibl and his four sons, even the seven year old child assisting; that after the family returned to Chicago the year subsequent to the death of the father, the fence was kept in repair by Degnan, and by the Zirngibl boys upon their occasional visits, until the bar of the statute became effective in the summer of 1875, by the full completion of twenty years' adverse possession. Of

course, the grazing of Degnan's horse and cattle within the enclosure, the cutting of wild grasses by him therein, and the cultivation of a garden, are concomitant parts of the claim. This contention in regard to the fence is sustained, more or less, by the testimony of thirteen witnesses, five of whom are members of the Zirngibl family and eight are not. On the other hand, the contention of appellees is, that the fence was not built until ten years later, about 1865, by the Oemichs, who ran the ferry across the Calumet river from 1857 until May, 1870, and lived in a shanty on the point, and put up the fence in order to keep up their cattle. The *Oemich* theory in regard to the fence is sustained by the testimony of eleven witnesses. We are not aware that any of them have any personal interest in the event of this suit, and so far as we now recall, no such interest is suggested by counsel. We have carefully examined the quite voluminous testimony bearing upon the point now in issue. Our conclusion is, that the clear weight of evidence is on the side of the propositions that the Oemichs made that fence, and that there was no fence on that line, or anywhere near it, prior to its construction by them.

*Fifth*—It is claimed that Andreas Zirngibl built a shanty on the point out of unplaned boards that had washed ashore; that it was twelve by sixteen feet in size, had two windows, and a roof that sloped all one way; that he and his elder boys made it their fishing headquarters, and that one or more of them always slept there. There is also a great conflict in the testimony in regard to this matter. As, in any event, the shanty was abandoned when the family removed to Chicago, in 1856, it is wholly unimportant to settle this conflict. We may remark, however, that since the father and the older boys were engaged in the business of fishing on the lake and in the Calumet river, and the family lived some four miles away, we can see good reasons for their wanting such a shanty as a place for keeping their seines and other fish-

ing tackle and boat tackle, and as a station from whence
to prosecute their vocation, and may further remark that
we perceive no like good reasons for their wanting a
fence across from the lake to the river, enclosing about
forty acres of swamp lands.

*Sixth*—One of the claims made by appellants is, that
Monika Zirngibl, the widow, was guardian in socage of
her children, and, as such, took possession of the land,
and avowed in her own name, and appointed Degnan to
take charge and care of the land as bailiff of all the
heirs.   Monika Zirngibl says in her testimony: "A man
had charge of this land for us after we moved away.   I
cannot say who it was.   He was a hunter.   I told him in
German.   I showed the land to him, and told him that I
would pay him for taking care of it when I could,—that
I would give him land or money, as he wished.   He was
not a very large man.   He wore a fur cap.   He had a
couple of dogs and carried a gun on his back.   He had
reddish eyes.   He spoke very quickly.   I think he was an
Irishman.   He lived near the station called at that time
Ainsworth."   Other evidence identifies this hunter with
Degnan.   He was generally around with his dogs and his
gun, and was an ill-natured man, and sometimes, though
not always, objected to so many people moving into that
part of the country.   He sometimes claimed he owned all
the land on the point, sometimes claimed he had charge
of it for a widow woman in Chicago, and sometimes
claimed he had charge of it for George W. Clarke, who
was then the holder of the patent title.   His widow,
Bridget M. Degnan, testifies that her husband was taking
care of the land for a widow woman who buried her hus-
band; was watching it for George W. Clarke, too; was
watching the widow woman's land for both of them; that
five or six drunken men tore the house down he was living
in, and then his new house got burned, and then her hus-
band said "he would go to a place where we would not be
fighting," and so they moved to Missouri.   If Degnan was

in charge as the bailiff of both the true owner and the adverse possessor, it is exceedingly difficult to see how the possession of the latter was visible, notorious and exclusive. Since adverse possession cannot be made out from inference, and the presumption is in favor of the true owner, the conclusion must be, that if Degnan was in possession at all, (which we very much doubt, in fact, don't believe,) then such possession was the possession of the true owner.

*Seventh*—Then there is the matter of the supposed possession of the Zirngibls through the Behns, and the Hauslers, and Heinke, Meirendorf and August Magaritz, so-called "tenants." The claim is, that they moved upon the land under verbal licenses from Degnan. Perhaps what we have just above said sufficiently disposes of this claim. Be this as it may, at the hearing they all of them, unless it be Magaritz, denied the supposed licenses and tenancies. According to their testimony there given, many of them came on the land by permission of the canal and dock company, or some of its agents, and some of them "just went in there and built and lived on it." Martin Behn, Sr., testifies that he did speak to Frank Degnan "that he should live there," and that when he spoke to Degnan, Degnan said that the land was free and he could move on it. Magaritz tries to carry water on both shoulders. He says: "I was about moving or moved when Degnan came, and at the same time was Jackson there, too." And he further says, "that what I got in fence is mine—that I got that from Jackson since 1872." It is true that some of these occupants of the land swore quite otherwise in the Tabor partition suit in the United States Circuit Court, but they were then in great stress, and had a deep personal interest in defeating the canal and dock company. At the time of the hearing of this cause they had nothing to hope for or fear from that company. The situation at the time their first depositions were taken is suggested in the deposition of Martin

Hausler taken in this suit.   He says:  "Over before the master in chancery in the post-office, George Zirngibl said, if we all stuck together we might get something out of the company, and if we didn't stick together we wouldn't get anything."   And he further says that Colehour said:   "They would bring a new suit, and by that time the dock company would get tired, and would be wanting to use the land, and would probably make us an offer, and we would get some money out of it,—that was how it was."   Besides all this, it appears in evidence that the canal and dock company paid the taxes on the land for the year 1870, and for each subsequent year to and including the year 1890, and that the Hauslers, the Behns and Magaritz, either before or shortly after they went on the land, took formal written leases from that company, and continued to renew them and pay rents upon them for varying periods, but all for several years.

The ultimate result reached by us is, that appellants have signally failed herein to establish the bar of the Statute of Limitations.

Some most remarkable facts appear in this suit.   It is remarkable, if the Zirngibls had a deed of the land and were in actual possession of it, that for thirty-two years they never either paid taxes upon it themselves or made inquiry whether Degnan had paid taxes.   It is remarkable that they allowed the canal and dock company to expend the sum of $100,000 in improving the land, and yet never gave them notice of their title and possession or made any inquiry.   The claim that they supposed the government was making the improvements is a very poor and lame explanation.   It is remarkable that during the years that they saw the forty acres change from an almost valueless swamp to a tract of land worth a million of dollars, they made no attempt to derive income or profit from it, or effect a sale of any part of it.   It is remarkable, if they had a deed and were in actual possession, and had been for thirty-two years, that they should con-

vey to Colehour a three-fourths interest in the land, taking in return his verbal promise that he would straighten matters out, and guarantee to them that in the event of success they should receive for the one-fourth interest retained, as much as $125,000.    There are other remarkable things in the case, but we forbear to state them.

The decree of the circuit court dismissing the bill of complaint of appellants and granting relief upon the cross-bill of appellees, as against the Zirngibls and the other defendants, was, with one single exception, just and right and equitable. . The exception is this: Appellants established a bar and a title, by limitation, to the grave of their ancestor, Andreas Zirngibl, and to the ground within the enclosure around it.    The decree is so modified as to award to the widow and heirs the grave and the ground within the fence that encloses it, with right of access to and egress from it.    In all other respects the decree is affirmed.    And it is ordered that appellants pay all the costs of this court.

*Decree modified and affirmed.*