EDWARD ROBY
*v.*
THE CALUMET AND CHICAGO CANAL AND DOCK CO. *et al.*

*Opinion filed June 23, 1904—Rehearing petition stricken October 11, 1904.*

1. ADVERSE POSSESSION—*what elements essential to adverse possession.* Adverse possession, to be sufficient to defeat title of the real owner, must be hostile, actual, visible, notorious and exclusive, and must be continuous and under claim of title; and all of these elements must be established by clear proof.

2. RES JUDICATA—*judgment in forcible detainer not an adjudication of title.* A judgment in forcible detainer is not an adjudication of title, since the only inquiry in such case is the right to immediate possession of the premises.

3. REHEARINGS—*argumentative petition will be stricken from the files.* A petition for rehearing which re-argues the case in violation of rule 30 of the court will be stricken from the files.

APPEAL from the Superior Court of Cook county; the Hon. A. H. CHETLAIN, Judge, presiding.

JAMES E. MUNROE, for appellant.

EDWARD ROBY, *pro se* on rehearing.

EDWARD O. BROWN, (JOHN W. GREEN, of counsel,) for appellees.

Mr. CHIEF JUSTICE RICKS delivered the opinion of the court:

This suit was begun by a bill filed December 8, 1887, by appellant, in the superior court of Cook county, against the Calumet and Chicago Canal and Dock Company and Charles W. Colehour. The bill was afterwards, on September 12, 1892, amended by making Horace A. W. Tabor a party defendant. The purpose of the bill was to partition a certain tract of land in Cook county, as described in said bill, containing about nine acres. The substantial averments of the bill, as amended, are, that complainant is the equitable owner in fee of the undivided one-sixth part of the land in question; that on August 26,

1884, Robert E. Little made to Colehour a deed of that date, recorded May 27, 1887, whereby Little conveyed to Colehour an undivided one-third of said land in fee; that by deed of December 30, 1884, and recorded July 26, 1887, Colehour declared that he had received one undivided half of said undivided third of said land so conveyed to him by Little in trust for complainant, and in consideration of the premises and one dollar and other valuable consideration Colehour agreed to convey to complainant said undivided sixth when requested to do so, whereby complainant became, in equity, the owner in fee of an undivided one-sixth part of said land; that after the making of said deeds, Little, Colehour and complainant remained in possession of said land, as tenants in common, until September 21, 1887, when Little made to the dock company a quit-claim deed dated and recorded as of that date, whereby he conveyed all his interest in said land; that the dock company, having succeeded to the interest of Little in said land, denied complainant's right, in equity, to an undivided sixth thereof, and refused to allow such sixth part to be set off to complainant, etc. The bill waived the oath to the answer and prayed for partition and general relief.

The answer of the dock company denies that complainant is the equitable owner of an undivided one-sixth of the premises in question; admits the making of the deed by Little to Colehour and the declaration of trust by the latter to the complainant, as alleged in the bill; denies that Little, Colehour and the complainant were or remained in possession of the premises as tenants in common, as alleged in the bill; admits that at the time alleged in the bill, Little made to the dock company a quit-claim deed of all of the land in question, but avers that Little was never the owner, legal or equitable, of said land; avers that the dock company was, prior to any pretended conveyance of the land in question by Little to Colehour, the owner in fee of the land by title deduci-

ble of record, and that Little was in possession of a portion of the land as a squatter, and that suit for partition of the land was pending then and at the time of filing the answer of the dock company, in the United States Circuit Court of Illinois, to determine Little's and others' title to different pieces of land, the title of the suit being Horace A. W. Tabor against the Calumet and Chicago Canal and Dock Company, etc., and said Little being one of the defendants; avers that said deed from Little to Colehour and the declaration of trust from Colehour to complainant were merely evidences of a bargain by which complainant and Colehour were to contest the title of the dock company and Tabor; avers that without recognizing the claim of Little to any portion of the land in question, and to compromise a troublesome litigation, the dock company paid to said Little a certain sum of money and took his quit-claim for said land, etc. All the defendants adopted the dock company's answer.

Replications were filed to the answers and the cause was referred to a master in chancery to take the testimony and report the same, together with his conclusions of fact, etc. The master, after taking the evidence, prepared his report, and it being favorable to the dock company, objections were filed by appellant, and the objections being overruled by the master, exceptions were filed in the superior court of Cook county, and the exceptions being overruled by the chancellor, a decree was entered dismissing the bill for want of equity. An appeal was accordingly prosecuted to this court.

The only question presented by the record is the superiority of title to the undivided one-sixth of the tract of land, as described in the bill, as between appellant and the Calumet and Chicago Canal and Dock Company, which company is herein designated as the dock company, for convenience. It will therefore be necessary to ascertain the manner and conditions under which each obtained title thereto.

The evidence discloses that appellant claims title by reason of a certain quit-claim deed dated August 26, 1884, in which Robert E. Little and wife purported to convey to Charles W. Colehour, for the consideration of one dollar and other valuable consideration, an undivided one-third part of the land in controversy, and an instrument dated December 30, 1884, wherein Charles W. Colehour made a declaration of trust in favor of Edward Roby to a one-half of his one-third interest. The deed, although dated December 30, 1884, was not put upon record until May 27, 1887, and the declaration of trust was not recorded until July 26, 1887. It therefore becomes necessary to ascertain how Little obtained this title, if he had any. To do this it will be necessary to give a short history of the property in dispute from the time it was first occupied.

It appears from the record that one John Kleinman, during the year 1848, built a shanty on some part of the premises in question, made some fence and enclosed a part of the land, and continued to occupy the same until 1856 or 1857. He at no time claimed any interest in the land, and when he left took everything with him which he had placed upon the premises, including the shanty. A man by the name of John Yarno, a boat-maker, who had been living with Kleinman, remained upon the premises and built himself a shanty in substantially the same place as the former shanty, and also built some fences, and lived there for about three years, but what became of Yarno is not disclosed by the evidence. It next appears that in 1860 or 1861 Peter Rich, who had lived in the neighborhood for some time, made a bargain with Charlie Culver and a man by the name of Hoosier, purchasing their interests, and immediately took possession. It does not appear how or when Culver or Hoosier obtained the possession of the premises. Rich made some additions to the buildings and erected new fences and lived there until 1864, when a man by

the name of William Hunt, who was a fisherman, stopped with him a few days and then purchased all of Rich's property, taking a bill of sale therefor, consisting of fourteen fishing nets, six or eight boats, house, barn, cellar, some chickens and cows.   Nothing was said about real estate, and apparently neither one claimed any part of the real estate.   The consideration for the sale was $250, and by agreement Rich went to Chicago and was paid $100 in cash and took a mortgage upon the property above described for the $150, being the balance of the purchase money.   It appears that the $100 paid was taken out of Mrs. Hunt's purse and handed to Rich, but the mortgage was executed by William Hunt and afterwards paid by him.   Hunt took possession and continued to occupy the place, together with his wife, until February, 1872, when he died.   It appears that shortly after Hunt came into possession of the premises he was called upon by Elliott Anthony, who claimed to own the premises.   Anthony informed Hunt that he was the owner of the premises and asked him to execute a lease, which Hunt agreed to and did, and paid rent thereafter.   Afterwards, on a subsequent visit to the place, Anthony was informed by both Mr. and Mrs. Hunt that they wanted more ground, in order to raise potatoes, etc.   After looking over the ground, terms were agreed upon, and the additional land and terms were endorsed upon the back of the original lease and signed by Mr. Hunt.   Subsequently, Anthony, as owner, engaged surveyors and located streets and blocks in that vicinity, including the premises occupied by Hunt, and placed posts in the ground at the street corners, with the names of streets affixed thereto. Afterwards one R. W. Ralston, who was connected with the Northwestern Fertilizing Company, informed Hunt that the said company had become the owner of the premises occupied by him and negotiated with Hunt for the premises desired, and he accepted the terms and a lease from the Northwestern Fertilizing

211—12

Company, and apparently no claim of ownership was laid to the land. It appears that afterwards the East Chicago Harbor Company obtained title, and Ralston, being secretary of the company, executed another lease to and with Hunt for the premises. This lease from the harbor company to Hunt bears date January 1, 1870, for a term of five years, at a rental of $25 per annum. Another lease was afterwards executed between Hunt and the dock company, making in all four leases executed by Hunt. After the death of Mr. Hunt, Mrs. Hunt remained in possession and refused to pay rent, claiming that it was her money that purchased the premises and that she owned the fee to the said property, and a suit in forcible detainer was brought, in which she was victorious. Mrs. Hunt resided on the premises until December 10, 1879, when she died testate, devising said land to Robert E. Little, who succeeded her in the possession of said land. Little remained in possession until September 21, 1887, when he made his quit-claim deed above described to the dock company.

It will be seen that up to the time of the death of William Hunt, in 1872, the premises had been successively in the occupancy of the following persons and under the following state' of facts: John Kleinman, from 1848 or 1849 to about the year 1857, who disclaimed any ownership or title to the land and abandoned the possession. The next person found in possession was John Yarno, whose occupancy is not made clear by the evidence as to the time he went into possession or when he ceased to occupy, or whether or not he transferred the possession of said premises to any person. Peter Rich was in occupancy from 1860 to 1864, when he sold all his personal property to William Hunt, making a bill of sale therefor, and claiming no title to the real estate. Hunt occupied the same from 1864 to 1872, and executed four different leases from four different persons and corporations who claimed to be owners.

It will thus be seen that appellant claims title only by reason of adverse possession of himself, Little and others. To offset this contention appellee shows the following chain of title: That the receiver and the register of the land office of the United States at Chicago, on the 15th day of June, 1836, issued to Madison Collins their respective receipt and certificate, reciting that he had that day purchased the land herein described in the complainant's bill, containing 9.88 acres, and had paid therefor the sum of $12.25. And on the same day Collins assigned and transferred to Samuel C. George all his right, title, claim and demand in and to said described premises, and afterwards, on the 20th day of May, 1841, by patent bearing that date, the United States granted to said Samuel C. George, as assignee of Madison Collins, the premises in dispute. On March 7, 1838, Samuel C. George conveyed and quit-claimed to E. S. Wadsworth, with covenants against any person claiming by, through or under said grantor, together with other land, and on June 27, 1870, Wadsworth and wife conveyed the premises, for the stated consideration of $500, to Oramel S. Hough, and on the 4th day of August, 1870, Hough and wife, for a consideration of $500, conveyed to the Calumet and Chicago Canal and Dock Company all right, title and interest to said premises.

It is accordingly shown by the evidence that by patent to George and *mesne* conveyances above mentioned, the appellee dock company became seized of the legal title and fee to the premises described in the bill, as shown by the record, and must be held to be the real owner unless the appellant and his grantor have held adverse possession for twenty years prior to the deed executed by Little, in 1887, to the dock company.

Adverse possession, to be sufficient to defeat title of the real owner, includes five elements: It must be (1) hostile or adverse; (2) actual; (3) visible, notorious and exclusive; (4) continuous; (5) under a claim of title.

(*Zirngibl* v. *Calumet Dock Co.* 157 Ill. 430.)   And all these elements must be made out by clear and positive proof. Tested by these principles of law as applicable to the facts above stated, it is obvious that the said possession acquired by the various occupants did not ripen into a title to said land by twenty years' adverse possession up to the time of the execution of said deed by Little and delivery of possession by him of the premises to the dock company on September 21, 1887.   Not a single person in possession to the time of the death of William Hunt ever claimed any title to the premises.

It is further contended by appellant that by the verdict and judgment in the forcible detainer suit by the dock company against Mary Anne Hunt, who claimed title thereto, it was adjudicated that the said Mary Anne Hunt bought the land with her own money and entered into adverse possession thereof under her purchase on the 18th of April, 1864, and held such adverse possession until the case was adjudicated on March 7, 1874.   It appears from the evidence that after the death of her husband, William Hunt, Mary Anne Hunt refused to pay rent on the premises occupied by her and the dock company commenced suit against her.   The record of the case shows that the suit was commenced on the 3d of December, 1872, before a justice of the peace in an action of forcible detainer, and that the case was taken by appeal to the circuit court of Cook county, and that in the circuit court there was a re-pleader and the case was tried there by a jury in February, 1874.   We cannot see how this suit could be regarded as an adjudication of the title of Mary Anne Hunt, as the only thing that could be decided in an action of forcible detainer is the right of immediate possession of the premises, and we have repeatedly held that the title cannot be inquired into in proceedings of forcible detainer. *Riverside Co.* v. *Townshend,* 120 Ill. 9.

It will thus be seen from a review of the evidence that Mary Anne Hunt was the only person that was in

adverse possession of the land from the time of its occupancy, in 1848, until her death, which occurred in 1879. Her possession did not begin until 1872, after the death of her husband. Her adverse possession continued in the successor, Robert E. Little, up until the 21st day of September, 1887, when Little executed the deed to the premises and gave up possession to the appellee company. The evidence shows that Peter Rich, from whom it is claimed that Mary Anne Hunt purchased the land, received the possession on the 16th day of April, 1860. He had occupied said land from about the year 1860 until 1864, using the premises as a resort for hunting and fishing, and in the meantime had made some additions and repaired the fences, and accumulated some boats, fishnets, cows, chickens, etc., and on the date she claims to have taken possession he transferred them to William Hunt, her husband, and she was in joint possession with him from 1864 until the time of his death, in 1872, during which time, as above shown, William Hunt accepted from four different lessors who claimed to be owners in succession of the land, four different leases for successive terms of the land, covenanting therein to pay, and actually paid, rent therefor, the last of which leases bears date of January 1, 1870, and is executed by and between the said William Hunt and the defendant dock company. All of this was done with the knowledge, and apparently without the dissent, of Mary Anne Hunt. It necessarily follows that up to the time of his death, and by his acts and conduct, Mrs. Hunt, his wife, was deprived of the character and quality of adverse possession. It would make no difference whether William Hunt was principal and acting in his own behalf, or that Mary Anne Hunt was the principal and William Hunt acting as her agent. The evidence abundantly shows that Mary Anne Hunt acquiesced, until after his death, in all the acts of William Hunt relating to the land and the possession thereof.

We think the evidence abundantly shows that up to the year 1872 there was no adverse possession, and inasmuch as the adverse possession, as shown, only ran during the years between 1872 and 1887, being for a term of fifteen years, the Statute of Limitations did not run.

We think the evidence sustains the findings of the master, in which he reports that "the possession of the said premises described in the bill filed in this cause was not held by complainant and his predecessor in possession for twenty years prior to the 21st day of September, 1887, in actual, visible, notorious, exclusive, continuous and adverse possession thereof, claiming title thereto, and that the said complainant is not equitably the owner of said lands and premises described in said bill or of any interest therein, and has not, by the evidence in this cause, sustained said bill in respect thereof."

After a careful review of the evidence we are of the opinion that the decree of the superior court approving the report of the master and dismissing the bill for want of equity is correct, and the decree will accordingly be affirmed.

*Decree affirmed.*

Subsequently, on consideration of the petition for rehearing prepared and filed in the above cause by the appellant, *pro se*, the court announced, through Mr. Justice Boggs, the following additional opinion:

The petition for rehearing filed in this case is prepared in disregard of the rule of this court which directs that causes shall not be re-argued in petitions for rehearing. The petition contains fifty pages of argument, going over the case in substantially the same manner as was done in the brief and argument filed in the first instance. Admitting that this is a violation of the rule, appellant has filed, in connection with the petition for rehearing, printed suggestions, some ten pages in length, which suggestions are largely an attack upon the rule but partially devoted to the claim that there are some

peculiar features in this case that justify a departure from the rule. We have examined the petition and have considered what is said in the suggestions, and are not disposed to depart at all from the rule, which is founded upon the long experience of the court. We are not moved at all to depart from or abandon the rule. The opinion in the case has been slightly modified with reference to the statement of a fact, which in nowise affects the conclusion reached by the court or any principle of law announced in the opinion.

The petition for rehearing, being a violation of our rules, will be stricken from the files.

*Petition stricken.*