WILLIAM C. GODFREY *et al.*

*v.*

THE DIXON POWER AND LIGHTING COMPANY *et al.*

*Opinion filed June 19, 1907—Rehearing denied October 9, 1907.*

1. EJECTMENT—*when deeds may be considered as bearing upon question of adverse possession.* Where the grantee in a deed to mill property, which deed reserves to the grantor that part of the land within the tract described upon which the dam stands, subsequently mortgages the entire property without reservation, and all deeds and conveyances thereafter made purport to convey the whole property, each successive grantee taking possession to the fullest extent possible, such deeds, where they are all recorded, may be considered in connection with the acts of the parties in determining whether the possession of the successive grantees, as to the land upon which the dam stands, is adverse to the first grantor.

2. LIMITATIONS—*bad faith in acquiring color of title must be proved.* Bad faith in acquiring a deed must be established by proof before its effect as color of title can be defeated, since it will be presumed it was acquired in good faith.

3. SAME—*notice of adverse claims does not apply to section 6 of Limitation act.* Notice of adverse claims at the time of acquiring color of title is not bad faith and is of no consequence under section 6 of the Limitation act, which bars the paramount title, where one having color of title acquired in good faith has been in continuous possession of the property for seven successive years and paid the taxes thereon during such time.

4. SAME—*what is sufficient possession of land on which a dam is built.* Where the land in the bed of a river upon which a dam stands is included within the description of a deed constituting

color of title to the mill property, the possession of the mill property by the grantee, coupled with his use of the water power and keeping the dam in repair, constitutes possession of the entire tract described in the deed, including the land on which the dam stands.

APPEAL from the Circuit Court of Lee county; the Hon. O. E. HEARD, Judge, presiding.

WILLIAM BARGE, for appellants.

A. C. BARDWELL, E. E. WINGERT, and E. H. BREWSTER, for appellees.

Mr. JUSTICE FARMER delivered the opinion of the court:

This is an ejectment suit brought by appellants to recover land lying in the bed of Rock river, described in the second count of the declaration as "a parcel of land situated in the city of Dixon, being a part of certain premises conveyed by the estate of Joseph B. Brooks, deceased, and by one John Daley, to Charles Godfrey, and being that part of lot one (1) in Mill block, in the city of Dixon, on which a portion of the dam stood on January 1, 1866, which said tenements the plaintiffs claim in fee." Rock river at the place in question runs in an easterly and westerly direction, and part of the city of Dixon is on the north side and part on the south side of the river. River street is on the south side of, and runs in an easterly and westerly direction parallel with, said river. The south boundary of lot 1 in Mill block is the north line of River street and the north boundary is the middle of Rock river. The title is very complicated and involved on account of there having been a large number of conveyances, in many of which the land in controversy is purported to be conveyed and in many is purported to be excepted from the conveyance.

Appellants are the sole heirs of William H. Godfrey, who was the only son and heir of Harriet Godfrey, widow of Charles Godfrey. They claim Harriet Godfrey owned

the disputed premises; that she acquired title thereto by devise from her husband, and that on her death, intestate, in 1870, William H. Godfrey, her son, succeeded to the title by inheritance from her, and that by the death, intestate, of William H. Godfrey, in 1900, appellants became seized of the title by inheritance from him. The chain through which appellants seek to establish title from the government to Charles Godfrey is not a regular and unbroken one. Mill block probably derived its name from the fact that a stone flouring mill was built on a part of it, described as lot 1, about 1852. Said block is a subdivision of part of the south-east fractional quarter of section 32, township 22, north, range 9, east of the fourth principal meridian. It was patented to John Dixon and conveyed by him to John W. Dixon. John W. Dixon and wife conveyed it to the Rock River Dam and Bridge Company, a corporation, March 28, 1846. The "president and directors of the Rock River Dam and Bridge Company," on the 17th day of August, 1849, executed a deed purporting to convey the premises to the Rock River Hydraulic Company. This grantee was also a corporation. The deed from the "president and directors of the Rock River Dam and Bridge Company" was signed by "John Dixon, president," and by eight persons as "directors." The next conveyance in appellant's chain of title is a deed from Joseph B. Brooks to John Dement, dated June 22, 1854, and a conveyance from John Dement back to Joseph B. Brooks the same day. No conveyance from Brooks is shown by the evidence.

In 1857 a bill in chancery was filed by John Daley, to which the widow and heirs of Joseph B. Brooks and others were made parties, asking leave to sell real estate for the payment of partnership indebtedness. The files in the case could not be found, but a deed from John Daley, as commissioner, to Charles Godfrey, purporting to be made in pursuance and by authority of the decree entered in that case and dated November 20, 1858, was introduced. The

description of the land purporting to be conveyed by that deed is a part of the south-east fractional quarter of section 32, south of Rock river, "beginning at a point on the north side of River street, in the town of Dixon, 87 feet easterly of where a line running southerly from and parallel with the east side of the stone mill on the said land intersects the north line of said River street; thence westerly along said River street 182 feet; thence northerly on a line at right angles with said River street to the north bank of Rock river; thence easterly along the north bank of said river to a point where a line running northerly from the place of beginning and at right angles to the north line of said River street would intersect the north bank of said river; thence southerly to the place of beginning."

Charles Godfrey died in 1864, leaving a will, in and by which he devised all his real estate to his widow, Harriet Godfrey. January 1, 1866, Harriet Godfrey by separate deeds conveyed to Nathan Underwood the undivided three-fourths and to Henry P. Becker the undivided one-fourth of the land, described as "being a part of certain premises conveyed by the estate of Joseph B. Brooks, deceased, and by one John Daley, to the said Charles Godfrey, * * * more particularly described and bounded as follows, to-wit: On the south by the north line of River street; on the west by a line drawn on and along the outside of the west wall of the mill now standing on the premises, described and known as the 'Dixon mill,' and by said line extending southwardly to said River street and northwardly to Rock river; on the east by a line parallel with said west line, and commencing in said River street at a point 125 feet east of where said west line would strike said street, having a front on said River street of 125 feet, and bounded on the east and west by right lines running northerly from said street and extending to Rock river, *excepting and reserving, however, any portion thereof on which any part of the dam now stands,* together with the

mill buildings situated thereon and all the privileges and
appurtenances thereunto belonging or in anywise appertain-
ing, as derived by the said Charles Godfrey by or under the
said deed so to him made as aforesaid; excepting and re-
serving the right to use, occupy or improve the race in front
of said premises (on the south) for the purpose of using
and drawing water through the same, it being stipulated
that said party of the second part shall pay and keep up
such portions of all taxes, repairs and assessments as may
belong or be apportioned to his interest in said premises
and which said party of the first part or her heirs would
have to keep up, pay and sustain, both in the dam and in
said race from its mouth to the west line of said premises.
* * * Said party of the second part also covenants to
keep open and in good order a road or driveway, not less
than twelve feet in width and of sufficient height for the
passage of loaded wagons, from said River street onto the
dam, subject to the use and control of the said party of
the first part, her heirs and assigns."

The land sought to be recovered by appellants under the
second count of their declaration is that reserved and ex-
cepted from the conveyance as the portion "on which any
part of the dam now stands." The dam referred to was
built between 1845 and 1850, extending across Rock river,
its south end adjoining or being near to the wall of the
stone mill on lot 1, and furnished water power for indus-
tries on both sides of the river. Said dam has been main-
tained ever since it was originally built, though not exactly
in the same place. The old dam was constructed of trees,
timbers, stone and dirt, and at different times was so washed
out and injured by floods as to necessitate re-building and
repairing portions of it. In 1904 it was washed out so
badly that it was re-built by appellees by a system of cribs
filled with stone. The crest of the dam as re-built was
twenty-five or thirty feet west of the crest of the old dam,
and a considerable quantity of stone was taken from the

old dam and used in building the new one. A concrete wall at the south shore of the river, east of the land in controversy and extending diagonally in a westerly direction 230 feet and terminating at the south end or abutment of the new dam, was at the same time constructed by appellees. This wall crosses and a portion of it rests on land that was occupied by the old dam.

It will be seen from the chain of conveyances before referred to, that the deed to the Rock River Hydraulic Company was from the "president and directors of the Rock River Dam and Bridge Company." It was signed by "John Dixon, president," and by eight other persons, to the right of whose names is written the word "directors." The original deed was not produced at the trial but the record of it was introduced in evidence. As copied in the record before us there appears immediately after John Dixon's name, and before the word "President," in parenthesis, the word "seal," and the same word appears in the same manner after the names of each of the eight who sign as directors. Appellees insist that this conveyance was invalid; that to constitute a valid conveyance by a corporation the deed must be executed in the name of the corporation, under its corporate seal, and that the words "President" and "Directors" after the signatures to the deed in question are merely descriptive of the persons and cannot be held to make the conveyance a corporate act. Appellants contend the deed was a valid conveyance, and they also introduced in evidence a quit-claim deed from the Rock River Dam and Bridge Company to Charles Godfrey, dated April 6, 1861, which they contend conveys to the grantee the property in controversy. It is also contended by appellees that even if the deed from the president and directors of the Rock River Dam and Bridge Company to the Rock River Hydraulic Company was a valid conveyance, appellants' chain of title fails because it does not appear that the Rock River Hydraulic Company ever conveyed to any one.

To meet this objection appellants offered in evidence a decree rendered in a suit in chancery by John Daley against the widow and heirs of Joseph B. Brooks and others as defendants. The decree was entered at the June term of the Lee county circuit court, 1857. The files, papers and evidence taken in the case could not be found. The decree is preceded by the title of the cause, to the right of which the form of action is stated as "Bill for leave to sell real estate to pay partnership debts." The decree recites that the cause was heard upon testimony taken and reported by the master and proofs and exhibits in open court, and that it appeared from the evidence "that said premises and mills set forth and described in said complainant's bill of complaint herein" were purchased, owned and used by the firm of Brooks & Daley for the purposes of their partnership business; that said partnership was owing about $2000 to various persons, "besides the sum due at the time of the death of said Joseph B. Brooks to said John Dement for the original purchase of said property." The decree further found that the legal title to the property was in Joseph B. Brooks but that he held it in trust for the partnership, and directed that John Daley "sell said premises" at public or private sale and use the proceeds in the payment of the partnership indebtedness. Daley was appointed by the decree a commissioner to make a deed to the purchaser, "conveying the legal title of which they [heirs of Brooks] became seized, * * * hereby authorizing the said commissioner so to convey all the legal title to said premises of which the said Joseph B. Brooks died seized." The decree nowhere describes the land. The deed made by Daley to Charles Godfrey begins by reciting that "whereas, at the Lee county circuit court, at the April term, A. D. 1856, in the matter of a certain bill of complaint on the chancery side of said court filed by John Daley" against the defendants in said suit, naming them, for the sale of real estate to pay partnership debts of the firm of Brooks & Daley,

"said real estate being specifically described in said bill of complaint as follows: A part of the south-east fractional quarter of section 32 south of Rock river, and bounded as follows: Beginning at a point on the north side of River street, in the town of Dixon, 87 feet easterly of where a line running southerly from and parallel with the east side of the stone mill on the said land intersects the north line of said River street; thence westerly along said River street 182 feet; thence northerly on a line at right angles with said River street to the north bank of Rock river; thence easterly along the north bank of said river to a point where a line running northerly from the place of beginning and at right angles to the north line of said River street would intersect the north bank of said river; thence southerly to the place of beginning." Said deed then conveys to Godfrey the same property by a slightly different description.

Appellees contend the deed from Daley did not convey to the grantee the land in dispute, because, among other reasons, the decree does not authorize the sale and conveyance of said lands, there being no lands described in the decree from which it could be told what land was to be sold; and also that it does not appear upon what evidence the finding in the decree that Brooks held the legal title in trust for the partnership of Brooks & Daley was based; that the recitals in the deed cannot supply the omission, and that such finding cannot be held conclusive against appellees. It is also objected that said deed only authorized and directed the sale and conveyance of the interest of the heirs of Brooks. Appellants contend that the recitals in the deed are proper to be considered in determining what land was ordered sold by the decree, and that for the purposes of this case the presumption is the findings in the decree were based upon good and sufficient evidence, and that said decree is conclusive against the appellees. In addition to the above mentioned objections raised to appellants' title, appellees set up the twenty-year Statute of Limitations; also

possession under color of title made in good faith and payment of taxes for seven successive years, as provided in section 6 of the Limitation act.

The trial court refused appellants' request to hold in propositions of law that they were the owners in fee and were in possession of the premises in controversy before the commencement of the suit and were ousted therefrom by appellees, and also refused to hold, at appellants' request, that appellees were not in adverse possession of the land, and refused to hold that they were not in actual possession of the land seven years under claim and color of title made in good faith. At appellees' request the court held that appellee the Dixon Power and Lighting Company, and those from whom it deraigned title, had been in actual, notorious and continuous possession of the land in controversy for more than twenty years, and that as against appellants such possession was adverse and exclusive; that said Dixon Power and Lighting Company had been in the actual and continuous possession of said premises, under claim and color of title made in good faith, for more than seven years prior to the commencement of the suit, and during said period had paid all taxes assessed against said land, and that appellants had no legal title to or interest therein. If the court ruled correctly in refusing these propositions of appellants and in holding appellees', it necessarily follows that the judgment for appellees was correct and should be affirmed.

It is contended by appellants that the possession by Underwood and Becker, and those claiming under them, of the premises upon which the dam was situated was not hostile but merely permissive and by virtue of the provisions in the deed from Harriet Godfrey. On June 15, 1868, Nathan Underwood and Henry P. Becker mortgaged the property to Phineas L. Underwood and Benjamin W. Underwood. The property was described in the mortgage substantially the same as in the deed from Harriet Godfrey

to Becker and Underwood, except there was no reservation nor exception of the land upon which the dam stood. This mortgage was foreclosed in the United States Circuit Court for the Northern District of Illinois, and a deed made by the master on December 7, 1872, to P. L. and B. W. Underwood, the description in the deed following that of the mortgage. In February, 1874, B. W. Underwood by quit-claim deed conveyed to P. L. Underwood, and on the 23d day of October, 1876, P. L. Underwood conveyed to Henry P. Becker an undivided three-eighths and to Nathan Underwood an undivided five-eighths of said premises. In 1880 and 1881 Nathan Underwood and Henry P. Becker mortgaged to Hosmer, Crampton & Hammond the same premises to secure notes amounting to $43,000. Default having been made in the payment of the notes, the mortgages were foreclosed at the June term of the Lee county circuit court, 1885, and the property was sold to the mortgagees. No redemption having been made from said sale, the premises were conveyed by the master to Hosmer, Crampton & Hammond in July, 1887, for a consideration, as expressed in the deed, of $53,058.65. In 1887 Hosmer, Crampton & Hammond conveyed the same property to the Dixon Milling Company, and in August, 1892, the Dixon Milling Company conveyed the same premises to the Dixon Power and Lighting Company, one of the appellees in this case. All of the aforesaid deeds and mortgages were recorded at or about the time of their execution.

It will be seen from an examination of the deeds and mortgages in the record that in the various conveyances, from the time of the making of the mortgage of June 15, 1868, by Underwood and Becker to P. L. and B. W. Underwood, to the time of the conveyance to the Dixon Power and Lighting Company, in 1892, the grantors in the deeds and mortgages purported to own and convey all of the premises in controversy. It appears from the evidence that the mill building on lot 1 has been used or possessed by

appellees and those through whom they claimed, continuously since the conveyance to Becker and Underwood by Harriet Godfrey, in 1866. It also appears that the dam has been used to create water power for the operation of the mill and other industries adjacent thereto. The repairs on the dam were kept up and paid for by the various parties interested in the water power by contributions agreed on from time to time or fixed by arbitration, until in 1880, when an agreement was entered into defining the rights of the parties in the dam and water power created thereby, and fixing a basis upon which the payment of the expenses of keeping up and repairing the dam were to be made. It appears that the Godfreys contributed towards repairing the dam until the agreement of 1880 but paid nothing towards the repair of the south part of the dam after that time. The above mentioned agreement, which was recorded, is a very lengthy one and cannot be set out in this opinion. The Godfreys were not parties to the agreement. It appears, however, from a conversation between John Dement and Caleb Clapp, two of the parties to the agreement, and William H. Godfrey, father of appellants, that Godfrey knew of the fact of an agreement having been made between the parties relative to the matter of keeping the dam in repair, though it does not appear that he was invited to become a party to it nor informed fully of its terms. While there is a provision in the agreement of 1880 providing for the manner in which the interests of the parties should rebate or be reduced in the event of anyone not a party to the agreement having or procuring an interest in said dam, race or water power, the provision is only a precautionary one, and it is apparent from a reading of the whole agreement that the parties thereto claimed to own the whole dam and water power created thereby. Appellee the Dixon Power and Lighting Company, and its predecessors in title back to the deed from the master in chancery of the United States court to P. L. and B. W. Underwood, in 1872, entered into

228—32

the possession of the mill building and dam under deeds which purported to convey all of the land to the center of the river, without reservation or exception. These deeds were recorded. The nature and location of the premises in controversy were of such character that no other possession than was required for the preservation and repair of the dam was either desirable or practicable. For these purposes the evidence tends to show that from the time the agreement of 1880 was entered into between the parties claiming the dam and water power, said parties and their successors were the only persons who ever exercised any right of possession over the premises in controversy. The use and reparation of the dam upon the land in controversy involved the use and possession of the land upon which it stood. The deeds under and through which appellees claim title purported to convey to the grantees not merely the land upon which the mill building stood, but also the land upon which the dam stood. These deeds being matters of record are proper to be considered, in connection with the acts of the grantees, in determining whether their possession was adverse to appellants. (1 Am. & Eng. Ency. of Law,—2d ed.—p. 833, and authorities cited in note 3; *Dawson* v. *Edwards,* 189 Ill. 60; *Burgett* v. *Taliaferro,* 118 id. 503.) The authorities hold, that where a deed purports to convey two tracts of land, to one of which the grantor had no title, and the grantee enters into possession of the tract to which the grantor had title, such possession is not to be deemed adverse as to the tract to which the grantor had no title, and in such case the recording of the deed is not to be considered. But these authorities we do not think applicable to this case. In this case the premises are a portion of lot 1 in Mill block. That lot extends from the north boundary of River street on the south to the middle of Rock river, and the deeds through which appellees claim title purport to convey a portion of lot 1, which embraces the land in controversy, and, as we have before said, the only posses-

sion of the land in controversy practicable to be taken was taken by the grantees in the said deeds.

But if it be conceded that the evidence does not satisfactorily show a continuous adverse possession for twenty years, we are of opinion the circuit court properly held that the Dixon Power and Lighting Company had been in the continuous possession of the premises in controversy, under claim and color of title made in good faith, for more than seven successive years before the commencement of the suit, during which time it had paid all taxes assessed against the said land, and by reason thereof was the legal owner of the land in dispute. The Dixon Power and Lighting Company, and its immediate grantor, the Dixon Milling Company, paid the taxes on all of lot 1 in Mill block for a period of nineteen successive years, and if they were in the actual possession of the land under claim and color of title made in good faith during seven successive years of this period they have established title to the land under section 6 of the Limitation act. It is apparent from all the evidence in the case that the sale and conveyance of the property to the Dixon Milling Company in 1887, and by it to the Dixon Power and Lighting Company in 1892, were made in good faith. The question of good faith is one of fact and will be presumed, and before the effect of a deed as color of title can be defeated on that ground, bad faith must be established by proof. (*Dawson* v. *Edwards, supra,* and cases therein cited.) That these conveyances were made in good faith is not questioned by appellants. It then remains to be ascertained whether appellee the Dixon Power and Lighting Company, and its grantors, had possession of the premises under color of title.

In 1887 Hosmer, Crampton & Hammond conveyed to the Dixon Milling Company, a corporation, part of Mill block, described as follows: "Bounded on the south by the north line of River street, in said city; on the west by a line drawn on and along the outside of the west founda-

tion wall of the mill recently standing on the premises hereby conveyed and known as the 'Dixon mill,' and extending southwardly to said River street and northwardly to Rock river; on the east by a line parallel with said west line and commencing on said River street at a point 125 feet east of where said west line intersects said River street; on the north by Rock river,—said premises having a frontage on said River street of 125 feet and being bounded on the east and west by right lines running northwardly from said street and extending to Rock river, as aforesaid, together with the water power appurtenant to said premises, being 4000 shares in the dam across said Rock river in said city of Dixon, and the water power thereby created, together, also, with the mill building and any and all structures on said premises, and all fixtures and machinery of whatever kind fixed to or used in said mill building and other structure or structures." This deed was recorded February 13, 1888. On January 5, 1889, the Dixon Milling Company by quit-claim deed conveyed to the Dixon Milling Company, among other property, the lands with the same description as was conveyed to it by Hosmer, Crampton & Hammond, and on August 2, 1892, the Dixon Milling Company conveyed the property with the same description as that contained in the deed to the Dixon Milling Company, to the Dixon Power and Lighting Company.

It is conceded that if a description has for its boundary "Rock river," the land conveyed would extend to the center of the river. With the north boundary of the part of lot 1 in Mill block, as described in the said deeds, extending to the middle of the river, color of title is therefore established to the land to the middle of the river, including the land which the old dam stood upon and is now sought to be recovered. When the Dixon Milling Company received the conveyance, in 1888, it went into possession of the property by operating a flouring mill in the building, using the water power created by the dam for that purpose. It and its suc-

cessors kept the dam in repair and exercised such acts of ownership over the land in question as from its nature and location were susceptible of being exercised. The land was conveyed to the appellee the Dixon Power and Lighting Company and its grantor, the Dixon Milling Company, with no reservation of the land upon which the dam stood, and sufficient acts of ownership were exercised over it to comply with this section of the statute. Possession of the part of the tract occupied by the mill buildings was sufficient to give title to the whole tract. It was said in *Zirngibl* v. *Calumet Dock Co.* 157 Ill. 430, that "it is, of course, settled law that possession of part of a tract of land under color of title to the whole tract is possession of the whole tract described in the deed." This language was quoted in *Bellefontaine Co.* v. *Niedringhaus,* 181 Ill. 426, where the same principle was announced. It therefore appears that appellee the Dixon Power and Lighting Company sustained its defense of payment of taxes, with possession for seven successive years under claim and color of title made in good faith.

Appellants contend that the appellee the Dixon Power and Lighting Company was chargeable with notice of the reservation and exception in the deed of Harriet Godfrey to Becker and Underwood. This court has held that the rule in relation to notice of title in another party of adverse claims or defects in the title is of no consequence, and has no application to a claim of this kind arising under this section of the Statute of Limitations. *Keppel* v. *Dreier,* 187 Ill. 298; *Dickenson* v. *Breeden,* 30 id. 279.

Appellees having sustained their defense of title under the seven-year Statute of Limitations, it follows that the court did not err in so holding and in refusing appellants' propositions of law to the contrary. Arriving at this conclusion renders unnecessary a discussion of the other questions relative to the chain of title under which appellants claim.

The judgment of the circuit court is therefore affirmed.

*Judgment affirmed.*