WILLIAM C. GODFREY *et al.* Appellees, *vs.* THE DIXON
POWER AND LIGHTING COMPANY *et al.* Appellants.

*Opinion filed October 28, 1910—Rehearing denied Dec. 7, 1910.*

1. RES JUDICATA—*when judgment in ejectment is res judicata
of ownership of dam.* An action of ejectment to recover possession
of land upon which a dam is erected directly involves the owner-
ship of the dam as well as the title to the land, and a judgment
against the plaintiffs is *res judicata,* as between the parties, as to
the ownership of the dam, even though the title to the dam may
have been severed from the title to the land.

2. EVIDENCE—*deed without proof of possession is not evidence
of title in grantor.* A deed purporting to convey land on each side
of a river and an undivided half of a dam in the stream is not
evidence of title in the grantor, in the absence of any proof that he
ever had possession of any of the premises described in the deed.

3. SAME—*declarations of one in possession of land are not com-
petent to prove title in another.* The declarations of a person in
possession of land are admissible to show the character of his pos-
session but not to prove title in another person.

APPEAL from the Circuit Court of Lee county; the
Hon. OSCAR E. HEARD, Judge, presiding.

E. E. WINGERT, and A. C. BARDWELL, for appellants.

WILLIAM D. BARGE, for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

The appellees recovered a judgment against appellants
for $15,000. An appeal was taken to the Appellate Court,
and that court, finding that a freehold was involved, trans-
ferred the cause to this court.

The action was for damages occasioned by the destruc-
tion of a certain dam across the Rock river and of the
water power connected with it. A litigation between these
same parties concerning this dam was before us at a for-
mer term. (*Godfrey* v. *Dixon Power Co.* 228 Ill. 487.)

The opinion in that case states many facts material to this controversy which will be referred to but not repeated here.

A dam was built across the Rock river at the place in question before 1851 and a race was constructed through the Mill block, on the south side of the river. Industries using water power were established on either side of the river and were supplied with power from the dam. Frequent and extensive breaks occurred in the dam and repairs were made from time to time, which were sometimes very expensive. The dam was originally constructed of trees and stones and was repaired with the same materials. In the course of time these rotted and washed out in places and leaks were large and constant. In the spring of 1904 the dam was in bad repair, with many leaks, and a break occurred that year which practically destroyed the power. The evidence indicates that the water practically all went through the break and that there was no power. Many of the mills and other buildings on the south side of the river which received power from the dam were destroyed by fire in 1880. After that time no power was taken or used by the appellees or their predecessor in title, but the dam and water power were possessed, controlled and used only by the appellants and their predecessors in title and all repairs were made by them at their own cost. After the breaking of the dam in 1904 no attempt was made to repair or rebuild the old dam. A new dam was built of cribs filled with stone. The distance of the cribs from the west line of the old dam was about five feet, and the crest of the new dam was twenty-five or thirty feet west of the crest of the old dam. The abutments at the north and south ends of the old and new dams were practically in the same positions. The crests of the new dam and the old dam were of the same height. The plaintiffs claim to be the owners of an undivided half of the dam and of a large part of the water power created by it.

The declaration consisted of eight counts. The first count charged that the construction of the new dam caused a back-water which destroyed the old dam and the water power belonging to plaintiffs. The second count charged that the construction of the new dam caused back-water which destroyed the plaintiffs' water power. The third count charged that the plaintiffs owned certain property in Dixon suitable and convenient for the location thereon of machinery to be operated by water power and also owned certain water power created by the old dam, and that the building of the new dam destroyed the water power and injured the value of the plaintiffs' premises. The fourth count was similar to the third. The eighth count charged that the plaintiffs owned certain property in North Dixon suitable for the erection and maintenance of machinery to be operated by water power created by the old dam and also owned the right to cut a raceway around the north end of said dam, and that the building of the new dam destroyed the water power and greatly damaged the plaintiffs' premises. All these counts go upon the theory that the building of the new dam destroyed the old dam or destroyed the water power created by the old dam. In fact, as appears from the statement heretofore made, the old dam, as a means for the developing of water power, was destroyed before the construction of the new dam was begun and there was then no water power to be destroyed. The water was running uselessly through the break in the old dam. The appellants are not averred to have been under any obligation to the appellees to repair or rebuild the old dam or to build a new one. Had they done nothing, there would have been neither dam, water power nor claim for damages. After the new dam was built the water was raised to the same level as before. Had the old dam remained intact, the new dam, and the back-water caused by it, would not have interfered in the slightest degree with the water power of the old dam. The head was the same;

the boundaries of the pond were the same, except for the narrow space between the two dams; the water left the pond at the same place, flowed through the same race and back to the river at the same level as before, below both dams. There was an entire failure of evidence to sustain these counts.

The fifth count charges that appellees were the owners, of the undivided half of the old dam, and that the appellants chopped and split up the timbers and planks and dug up and carried away the stone, gravel, soil and rock in said dam and converted it to their own use. The question of appellees' ownership or possession of any part of the dam is in controversy, and many instruments have been introduced in evidence showing much complication in the title to the dam, the surrounding premises and the water power. Such title as appellees have to the dam descended to them from their father, who inherited it from his mother. She derived such title as she possessed under the will of her husband, Charles Godfrey, who died in 1864. So far as the south half of the dam is concerned, the question of ownership was decided adversely to the appellees in the case of *Godfrey* v. *Dixon Power Co. supra*. The south half of the dam stands upon lot 1 of the Mill block. In the case cited the present appellees sought to recover from the appellants, in an action of ejectment, that part of said lot 1 on which the dam stood, which the plaintiffs claimed in fee. The plaintiffs were defeated, the court holding that the defendants' plea of the Statute of Limitations was established. The appellees contend that this judgment concerned the land, only; that the owners had severed the dam and water power from the land, and that therefore the adjudication of the title to the land is not binding as to the dam. Whether severed or not, it is certain that the ownership of the dam carried with it the right to have it occupy the land on which it stood, and that so long as it did occupy that land such land was capable of no other pos-

session. The title to the dam was therefore directly in controversy, for if the plaintiffs owned the dam they had the right to the possession of the land, and should have recovered and not been defeated.

Charles Godfrey's title to the north half of the dam rests upon a deed to him from William W. Heaton, dated May 13, 1857, purporting to convey property on each side of the. river and the undivided half of the dam. There is no evidence in the record that Heaton ever had possession of any of the premises described in this deed, the dam or the water power, or that he had any title thereto. A deed without proof of possession or title in the grantor is not evidence. of title in the grantee. *Metropolitan Elevated Railway Co.* v. *Eschner,* 232 Ill. 210.

The appellees insist that the appellants should not be permitted to deny that Heaton had an interest in the dam because of a recital contained in a deed from John Dement, who was one of the appellants' grantors, to Harriet Godfrey and James B. Charters, dated February 28, 1867. That deed conveyed to the grantees the "undivided one-half of any excess or surplus of the water power created by the present dam across said Rock river at Dixon, in said county of Lee, and now owned by said John Dement, in common with the said Harriet Godfrey and James B. Charters." It is a familiar rule that the declarations of one in the possession of land are competent to show the character of his possession. The rule has no application here. The competency of such declarations is limited to showing the character of the possession of the person making them or the title by which he holds. (*Dodge* v. *Freedman's Savings and Trust Co.* 93 U. S. 379; *Bowen* v. *Chase,* 98 id. 254.) The appellants do not claim under the deed in question and the recital does not qualify the character of their grantor's possession or title. It is not competent to prove title in another. The evidence was insufficient to show that the appellees were the owners of any part of the dam.

The sixth and seventh counts of the declaration aver the appellees' ownership of lots 5 and 6, in block 3, in Dixon, and of certain water power, and the right to the perpetual use of an arch in the wall of the race, and of the use of a strip of land through which to convey, by shafting, a portion of their water power for propelling machinery on the said lots. They then aver that the appellants constructed across said strip a concrete wall, fourteen feet high and eight feet wide. The wall mentioned is the wall at the west end of the race. The evidence shows that this wall is the same height as the north wall of the race, and that all the shafts for the transmission of power to the south side of the street are carried over the latter wall; that the street is four or five feet higher than the wall, and that there is a tunnel under the street for the shaft to pass through. It further appears that it would not be proper to run the shaft below the top of the north wall because at an ordinary stage of water the gear-wheel would be under water. When the knitting mill which formerly stood on lot 5 was in operation the power was derived from a wheel placed north of the north wall of the race, and the water for this wheel was taken from the race through an arch in this wall. The evidence shows that the shaft by which the power was transmitted passed over the wall and through the tunnel yet remaining under the street, and the erection of the wall complained of would not interfere with such shaft.

Objections are made to the giving and refusing of instructions and other questions have been argued, but in view of what has been said these objections and questions will not probably arise on another trial and are therefore not now necessary to be considered or decided.

The judgment will be reversed and the cause remanded.

*Reversed and remanded.*