# CASES

## ARGUED AND DETERMINED

IN THE

# SUPREME COURT OF ILLINOIS.

R. N. THOMPSON, Appellee, *vs.* THE TOLEDO, ST. LOUIS
AND WESTERN RAILROAD COMPANY, Appellant.

*Opinion filed December 22, 1915.*

1. LIMITATIONS—*what must be proved by one claiming title under the Statute of Limitations.* One claiming title by adverse possession under the Statute of Limitations has the burden of proving that his possession for the statutory period was not only actual, visible, notorious and exclusive, continuous and under claim or color of title, but also that it was adverse to the true owner, as no possession that is not adverse can ripen into a title under the statute.

2. SAME—*the presumption is that possession is subservient to rights of owner of record title.* The presumption of law is that the possession of real estate is subservient to the rights of the owner of the record title, and where the possession has been consistent with his title, nothing but a clear, unequivocal and notorious disclaimer and disavowal of the title of such owner will render the possession, however long continued, adverse to him.

3. SAME—*effect when the original possession was permissive.* Where the original possession of land by a railroad company was permissive and consistent with the title of the true owner, the possession will not become adverse, so as to start the running of the Statute of Limitations, until there is some act by the company, of which the true owner has notice, which amounts to a practical ouster of the true owner.

4. EJECTMENT—*when defense of adverse possession is not established.* In an action of ejectment against a railroad company by the holder of the record title to the land the defense of the twenty year Statute of Limitations is not established, where the proof shows that the possession was originally permissive and consistent with the title of the true owner, and the defendant fails to show by clear proof that the character of such possession ever changed so as to become adverse.

APPEAL from the Circuit Court of Shelby county; the Hon. THOMAS M. JETT, Judge, presiding.

W. C. & T. M. HEADEN, C. E. POPE, and H. F. DRIE-MEYER, (CHARLES A. SCHMETTAU, of counsel,) for appellant.

GEORGE B. RHOADS, for appellee.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

R. N. Thompson, appellee, brought this suit in ejectment in the circuit court of Shelby county against the Toledo, St. Louis and Western Railroad Company, appellant, and the Baltimore and Ohio Southwestern Railroad Company, to recover possession of a strip of land sixty feet in width running diagonally from one railroad to the other in a curve, crossing a ten-acre tract of land at Cowden of which the appellee held the record title. The defendants pleaded the general issue. The suit was afterward dismissed as to the Baltimore and Ohio Southwestern Railroad Company under a stipulation by which that company was to abide the result of the suit as to the appellant. The issue was first tried by the court without a jury, and there was a finding and judgment for the appellee. The appellant paid the costs and had a new trial under the statute. The second trial was with a jury, and it resulted in a verdict for the appellee. Judgment was rendered on the verdict, and this appeal was prosecuted.

Record title in the plaintiff is admitted, and the defense made at the trial and now insisted upon is adverse possession by the defendant for twenty years.

There was practically no controversy about the facts. The railroad of the defendant is crossed at Cowden by the Baltimore and Ohio Southwestern railroad nearly at right angles, southeast of a ten-acre tract of land which was owned in 1886 by D. N. Harwood. He had been in the business of buying and shipping hay from a hay-barn near the Baltimore and Ohio Southwestern railroad, and when shipping by the defendant's road hauled the hay to the cars with teams. His hay-barn had burned and he built another larger barn on the ten-acre tract and planned it so that a stub-switch could be run to it from each railroad, so as to save hauling the hay by teams for shipment. By some arrangement with Harwood, who died before this litigation, the defendant built a stub-switch from its main track to the barn and sixty-two feet beyond, so that two cars could be pushed past the barn and a third car set at the barn for loading. The defendant's road was then a narrow gauge road and the track of the Baltimore and Ohio Southwestern railroad was of the standard gauge. The company owning the latter road also built a stub-switch from its track on the other side of the barn to the barn and a short distance beyond, and connected one rail with the rail of the defendant's switch and the other rail lay outside the narrow gauge switch, so that there were three rails past the barn and there was no connection between the two switches. Harwood shipped hay by each railroad, and each company would set its cars at the barn for loading and take them away when loaded. That condition existed about three years, until 1889, when the gauge of the defendant's road was widened to the standard width and the rails of the two stub-switches were connected at the barn, making one line of track between the two railroads. Both roads continued to bring their cars to the

barn for loading and Harwood continued to ship hay over the lines of both railroads by the same method as before. After the track became continuous it was used, whenever necessary, by each road for the interchange of cars. If it was desired to make use of the track for that purpose, either company would push any car at the barn out of the way until the transfer could be made and then set the car back at the barn for loading purposes. There was a wagon road crossing the connecting track south of the barn, and on some occasions when that crossing was blocked by cars the railroad company cleared the crossing at the request of Harwood. He became dissatisfied at the annoyance occasioned by moving the cars from his barn in the interchange of cars from one railroad to the other and had some negotiations to ascertain whether or not a switch could be laid on the opposite side of his barn, but when it was proposed that he should pay the cost of the construction he dropped the subject. On one occasion when a bridge was out, a passenger train was taken from the defendant's road over the track to the other railroad, and on account of the cars being longer than freight cars, on going around a curve a car damaged a coal shed near the track which belonged to the village of Cowden and was not on Harwood's land but was being used in his business. He repaired the shed so as to be far enough from the track to be clear of passenger cars, but the track was never used again for that purpose. Harwood and his successors up to 1910 were also in the machinery and coal business and the track was used for their accommodation, aside from the interchange of cars and the single occasion when the passenger train went over it when the bridge was out. The hay business was closed out in 1910, when shipments of hay from that region practically ceased. Harwood mortgaged the ten acres, and through a foreclosure of the mortgage and subsequent conveyances the title became vested in the plaintiff.

Both of the stub-switches were laid under some arrangement with Harwood, with his consent and by his solicitation, and the hay-barn was built and planned with a view to having such accommodations in his business. The possession taken in the first place by each company was permissive and consistent with the title of Harwood and was in no respect adverse to him. It is the law that a possession which has been of that character may become adverse so as to start the running of the Statute of Limitations if such change in the possession is clearly and satisfactorily proved. In any case, one claiming title 'by adverse possession under the Limitation law, having the affirmative of the issue, is required to assume the burden of proving that his possession for the statutory period was not only actual, visible, notorious and exclusive, continuous and under claim or color of title, but also that his possession was adverse to the true owner. (*Zirngibl* v. *Calumet Dock Co.* 157 Ill. 430; *Rich* v. *Naffziger,* 248 id. 455.) No possession that is not adverse can ever ripen into a title under the Limitation law. The presumption of law is that the possession of real estate is subservient to the rights of the owner of the record title, and where the possession has been consistent with his title, nothing but a clear, unequivocal and notorious disclaimer and disavowal of the title of such owner will render the possession, however long continued, adverse to him. In such a case something must be proved which amounts to an ouster of the true owner of the land, and until that occurs the Statute of Limitations does not begin to run. (*Rigg* v. *Cook,* 4 Gilm. 336; *Grand Tower Mining Co.* v. *Gill,* 111 Ill. 541; *Kirby* v. *Kirby,* 236 id. 255; 2 Corp. Juris. sec. 230; 1 Ruling Case Law, 702; 1 Cyc. 1060.) The true owner must have notice, either actual or by acts or conduct sufficient to notify him that the possession is claimed adversely to his title, so that he may not lose his land without his knowledge. The defendant did not sustain the burden of proof that there was

ever any change in the nature of the possession of the strip of land or that its possession ever became adverse and not consistent with that of the true owner. For aught that appeared the relations after the tracks were connected were the same as before, the strip being occupied for the mutual convenience and advantage of the parties in the prosecution of their business.

Some of the instructions given for the plaintiff are criticised, and it may justly be said that some of the instructions on each side were not strictly adapted to the material issue in the case. It seems to have been conceded by the defendant, in instructions which were offered by it and given, that there was no evidence of adverse possession up to the time that the track was all made standard gauge, and that was true. The real question was whether there was afterward a change in the character of that possession, and some of the instructions on each side, while stating correct rules of law, were not confined to that question. The fifth instruction given at the request of the plaintiff is criticised for saying that the adverse possession sufficient to defeat the legal title must be hostile in its inception, and the criticism is that the possession may not have been hostile until the gauge of the defendant's road was changed and the track began to be used for the interchange of cars, but instructions numbered 3, 6 and 7 given at the request of the defendant made it a condition of a finding in its favor that its possession in its inception was hostile. If instruction 5 did not strictly apply to the controverted question of fact the defendant could not complain. Instruction 7 is objected to because it stated, among other things, that the defendant's possession must be under claim of title, which the jury might understand to mean record title, but the jury were advised by instruction 5 given at the request of the defendant that no deed or other written evidence of title was required. While there may have been some inaccuracy in the instructions as applied to this par-

ticular case, the rules of law applicable to it were correctly given to the jury, and as no other conclusion could have been reached by the jury, no harm resulted to the defendant.

The judgment is affirmed.          *Judgment affirmed.*