(No. 21046.—

THE PULLMAN CAR AND MANUFACTURING CORPORATION, Appellee, *vs.* CHARLES J. STROH *et al.*—(ANNIE SABBE *et al.* Appellants.)

*Opinion filed June 24, 1932—Rehearing denied October 5, 1932.*

EVERETT G. BALLARD, and ARTHUR H. JONES, for appellants.

WINSTON, STRAWN & SHAW, and S. W. GEHR, for appellee.

WILLIAM H. SEXTON, Corporation Counsel, (JAMES G. SKINNER, of counsel,) for the city of Chicago.

Mr. JUSTICE DUNN delivered the opinion of the court:

This case in the circuit court of Cook county was a petition filed June 22, 1926, under the Burnt Record act, by the Pullman Car and Manufacturing Corporation, an Illinois corporation, to establish and confirm its title in fee

simple to a tract of land described as that part of the southwest quarter of section 14 and of the north 50 feet of the northwest quarter of section 23, township 37 north, range 14 east of the third principal meridian, lying west of the boundary line established by decree of the circuit court of Cook county entered January 21, 1925, in case No. B-90094, entitled City of Chicago vs. Pullman Co. et al. The city of Chicago, the South Park Commissioners, Annie Sabbe and Henry Sabbe, her husband, were made defendants and answered the petition. The city of Chicago also filed a cross-petition. Other defendants either disclaimed or made default. The cause was referred to a master, who, after hearing the evidence, made a report recommending the granting of the prayers of the petition and cross-petition. Objections made by the defendants Annie and Henry Sabbe were overruled by the master, and, having been renewed as exceptions before the chancellor, were overruled on the hearing, and a decree was entered establishing and confirming in the petitioner the title in fee simple absolute to the land described in the petition, except two strips of land, one 50 feet wide and the other 100 feet wide, and establishing and confirming the title in fee simple to these two strips in the defendant and cross-petitioner, the city of Chicago, to be taken, owned and occupied by it for streets, subject, however, to the reservation of an easement for railroad purposes and to one for a water intake-pipe, the description of these easements being contained in the decree. Mr. and Mrs. Sabbe, only, have appealed from the decree.

Henry Sabbe claims no independent interest in the litigation but only such as he has by virtue of his relation to Mrs. Sabbe arising out of her interest, if any. There was no controversy in the circuit court, and is none here, between the city of Chicago and the Pullman Car and Manufacturing Corporation, the cross-petition of the city having prayed for the establishment and confirmation of its title in fee simple to the two strips of land described in the

cross-petition and the decree, subject to the easements described in the cross-petition and the decree, and the Pullman Car and Manufacturing Corporation having by its answer admitted that the city was entitled to the relief prayed for.

The Sabbes' defense, as set forth in their answer, is that Annie Sabbe is the owner in fee simple and is in possession of a part of the real estate described in their answer as an island containing about seven acres, lying in the southwest fractional quarter of section 14 and the northwest fractional quarter of section 23, all in township 37 north, range 14 east of the third principal meridian, commonly known as Fraser's Island, together with the riparian rights appurtenant thereto, a part of the easterly shore line of such island bordering on Lake Calumet at 111th street extended east to Lake Calumet, and the remainder of the island being bounded and surrounded by channels connected with Lake Calumet. The answer alleges that Mrs. Sabbe was at the time of the filing of the petition, and for more than twenty years before, in the actual, continuous, visible, notorious and exclusive possession of the island, adverse, hostile and under claim of ownership against all the world; that she moved to the island and took possession of it in August, 1900, and erected on it a frame building which she occupied as her residence, and afterward she made valuable and permanent improvements from time to time, consisting of buildings, docks, boat houses, sheds and improvements to the value of $30,000, and since she entered into possession of the premises she has been in the actual and continuous possession of them, and Henry Sabbe, her husband, has an inchoate right of dower in them.

The island was a part of the marsh land along the border of Lake Calumet. In 1880, or before, the Pullman Company, the predecessor in title of the petitioner, had acquired the title to a part of the west shore of Lake Calumet both north and south of 111th street. Railroad shops were

erected by the company both north and south of 111th street, leaving 200 or 300 feet of marsh extending east to the west shore of the lake. In that year a dredge was brought in from the lake and opened up a straight channel directly west practically along the center of 111th street extended east. The dredge then turned south and continued dredging a channel for 200 or 300 feet, then turned southeast and continued the channel to the open water of the lake, forming an island on the south side of 111th street extended, known as Athletic Island. Later another channel was dredged from 111th street in a northeasterly direction probably 1000 feet and southeasterly from that point to a meeting with the 111th street channel. These three channels surrounded a triangular piece of ground, which was divided in the middle by another channel running north and south. The part on the west of the channel contained about three and three-fourths acres and that on the east about four acres. The land is marsh land and is higher at the borders than elsewhere, the material dredged from the channels having been piled on the borders. The channels were constructed by the Pullman Company for the purpose of bringing the water of the lake to its plant.

In 1882 or 1883 the Pullman Athletic Association was formed of Pullman Company employees and that company constructed on Athletic Island two grand-stands and a boat house, which were used by the athletic association until its dissolution, in 1895 or 1896, for track meets and aquatic sports. The association had boats and racing shells, which were kept in the boat house. Edward Fraser, a Pullman Company employee, was the caretaker who looked after the boat house, saw that none of the property was removed and kept it clean. He collected the fees for the rental of boats. He and his wife, Annie, were married in Morristown, New York, on July 3, 1895, and came to Pullman in December. He got employment of the Pullman Company as a molder. The first time she saw the boat house was in

1896. Her account of her connection with the boat house is that "it was a vacant house; there was no one around it and no one on the island at all. There were some old boats lying around that had been boats once upon a time. I came to go there to live through walking around there and meeting a man that was interested in that island when it was an athletic island, and in the course of my conversation he said: 'Well, this would be a good place to live, Fraser. You had better come up there. This is an old abandoned shack. You had better come up and live there.' That was the starting of my going to that island. * * * It was only a frame building with up-stairs and one row of boards around it—not finished up inside at all. It was just rough-boarded. So far as I could see it had never been occupied. It was not new. * * * Never knew of any owner of the island. It was only the athletic club that had been there." She further said that the round-house "was not there when I first went there. I went there in '96, and in the fall of '98 some members of the Pullman people started tearing up the island and started building that round-house, but it was not finished until the following year, 1899. I mean by Pullman people, they claimed to be the Pullman railroad, whatever branch that was of it. For two seasons after I moved there there was a grand-stand on there south of the boat house, towards the south end of the island. I had an ice cream stand there for two summers under that grand-stand. No games were connected with it. Had no concession for selling ice cream, renting boats or anything of that kind. Never had any written evidence of my right to occupy that building. I did claim it as my home. No, I did not claim to own it then." She testified that her husband had no duties in connection with the boat house and was not caretaker at any time after they moved there; that she had the building moved and put where it now is by John Sunderman, whom she hired to move it from the island where it was, south of 111th street—just a trifle

southwest of where it now is—to its present location across the channel, north of the middle of 111th street and a little east of its former location; that it was a two-story frame building with a drop-shed all around it, which was taken off before the building was put on the scow; that the building was moved to the edge of the channel the original way of moving a building. Movers' blocks were put under it there and the building was moved onto the scow and off the scow to its present location. This was in August, 1900. John Sunderman testified that he moved the building for Mrs. Fraser across the channel and to the present location about 200 feet and she paid him $225. Mrs. Sabbe further testified that the first year they lived in the boat house Fraser was employed by the Pullman Company and after that for a while at Harvey. He was a molder but did not work at his trade after February, 1900. In 1901, and until September, 1902, he had a saloon in Kensington. He broke his ankle and was disabled for six months. He helped around the boat house some but broke his leg in 1904. From 1907 he had heart trouble until his death, in 1914. The house was repaired and improved, a board walk bridge was built from the end of 111th street to the house, 461 feet, boat landings were built, and Mrs. Fraser engaged in the business of furnishing boats to the public for fishing and hunting. She has raised chickens and ducks, planted trees and raised vegetables on various parts of the island and has given permission at various times to others to build and use boat houses on the island. All this was done without permission from anyone. Her testimony is that she never had any kind of paper title to the house or the land and never had anybody's permission to occupy the boat house or the land to which she moved it. She states that no other person than herself has been in possession of the land or the building since 1900, and each succeeding year down to the present time she has always claimed to be the owner, has exercised unrestricted dominion over the whole property, and until

this suit her right to possession was not questioned. She also stated that if her husband ever became a tenant of any. part of the island by virtue of a lease from the Pullman Company she did not know it. Her husband could never read or write. Some time after 1900 she did teach him to write his name and address, but he never learned to read or write anything else. After his death she was married to Henry Sabbe on March 20, 1918.

On the part of the appellee, the Pullman Car and Manufacturing Corporation, E. K. Horton testified that he was superintendent of the Pullman railroad in 1900. The construction of the round-house on Athletic Island began in 1899 and was completed in 1900. The boat house had to be moved to facilitate transportation into the round-house with engines and materials. He had several conversations with Mrs. and Mr. Fraser before the house was moved and told them it would have to be moved and they would have to vacate. Both said they could not at that time. It was arranged that the boat house be moved to its present location. Fraser was to move the house and to have the land and the use of the boat house at a nominal rent and they were to look after the interest of the Pullman Company as far as the land extended. Horton furnished some lumber for their use in building the bridge and laid a water pipe from the main which ran into the round-house across to the south bank of the channel so that they could get their drinking and cooking water. Both Mr. and Mrs. Fraser were active in the affairs of the business done on the island. When Fraser was working on the platform, about a month or six weeks after the house was moved, Horton talked with him and they agreed on the terms of a lease, Fraser to have the boat house and the land, to keep squatters off and pay one dollar a month rent. A lease was afterward entered into, which was in evidence. It was dated October 16, 1900, was for a term of one year, to expire October 15, 1901, at one dollar a month rent, and demised the

building and its appurtenances, and a parcel of land not to exceed one acre, for "such uses as shall not interfere with the rights and privileges described in lease G. 50½ to G. R. Ratto. All the above being subject to the approval of the said G. R. Ratto." Edward G. Sweeney testified that Fraser signed the lease in his presence. It was shown by the records of the Pullman Loan and Saving Company, supported by the testimony of its officers, agents and employees, that Fraser paid the rent to July 1, 1907. Fred W. French, a collector for the Pullman Loan and Savings Bank, testified that a number of times he called at the boat house to collect the rent and informed Mrs. Fraser of his business there. Mrs. Sabbe was of the opinion that the signature to the lease, "Ed Fraser," was a forgery, because, as she testified, Fraser could not write his name in 1900, and to corroborate her testimony three witnesses, Irene Webster, Fred W. Schultz and Nick Webster, were produced, who testified that Fraser had told them that he could not read or write or sign his name; Irene Webster that in the fall of 1900 she wrote a letter for him and signed his name to it; Schultz that he wrote and signed a letter for Fraser in 1903 and Fraser said he wished he could write; and Nick Webster that he asked Fraser to sign a library card for him in 1898 and Fraser told him he could not write. The appellee presented two other signatures purporting to be Fraser's, given to the bank for the purpose of identification as a depositor, to Mrs. Sabbe, who testified that they looked like his genuine signature. They were identified as his signatures given to the bank. With these signatures as a basis of comparison, H. A. Rounds, an expert witness testifying for the appellee, was of the opinion that the two signatures and the signature to the lease had been written by the same person.

It appears clearly from the evidence that Mrs. Fraser attended to most of the affairs of the business done at the boat house and on the island, renting the boats and collect-

ing the rents for them and preparing and serving the refreshments. At times, also, Fraser mended boats and did carpenter work about the place. At times, but apparently not often, he rented boats. Mrs. Fraser was clearly the manager of the business and most of the work fell upon her. This is as might be expected in view of the fact that after they moved the house to the island Fraser was for a time engaged in other business, twice suffered disabling injuries and after 1907 was afflicted with heart disease. Mrs. Sabbe's testimony, if true, showed that she simply took possession of the boat house when it was on the south side of 111th street, and when that land was taken by the Pullman Company she moved the house to its present position and took and maintained exclusive possession of the island. The lease, however, and payment of the rent stipulated therein, showed that such possession as Fraser had was not in its inception hostile to the Pullman Company. The testimony of Horton, if true, shows that the moving of the boat house and placing it in the new location was by the express permission of the company, and other evidence shows that Fraser, with his wife's consent, became a tenant of the Pullman Company and continued to pay the rent of a dollar a month until 1907.

Mrs. Sabbe contradicted Horton in substantially every material part of his testimony and denied that she ever had any conversation with him about moving the boat house or ever talked to anybody about moving it except the man she hired to move it. She said some of the officials or employees of the Pullman Company might have been present when the boat house was moved, as there were hundreds of people around there. Neither Horton nor anybody else asked her, or Fraser in her presence, to vacate the boat house before she moved it. Horton used to be in the boat house every day the year after the round-house was built. She testified that she did not move the boat house surreptitiously. She had a man move it. She said: "I did not

only undertake to move it, I done it. I had the right to do it, because I was living in it and there was no other owner for it. I did not know that the Pullman Company owned it, and if they had they would never have let me move it away. I had possession and I kept it; engaged in business of renting boats; living in it; had home up-stairs and ice cream stand down under the grand-stand. The lower part I used for a boat delivery. * * * I moved it without any authority by any other company. My husband, Edward Fraser, was not concerned in the moving. * * * I collected the income from the rents from the boat house when it was on the south side. That is what I earned for my living. * * * Prior to moving the boat house my husband and I lived there as husband and wife. After I moved the boat house over north of the channel we continued to live in it as husband and wife. That is the place where I conducted my business. My relations with my husband during that time were pleasant. * * * When I first moved over on that island, in 1900, I did not have title to the island. I did not make claim of title then. I did not have any deed to any part of either of those islands. * . * * I paid the expense of moving the boat house over to the north channel. Mr. Fraser gave me no part of the money. I got the money from my ice cream stand—from the business I carried on. * * * I selected the present site of the boat house. That is as far as I had money to take it. I had to drop it somewhere. It was vacant land. I did not own it. I was not a trespasser. I thought the Pullman Company stopped back of their fence. I did not know they jumped over it. I thought their title ended at the fence. I did not know that the property of the Pullman Company car shops extended east to the water of the lake, because they have a fence all around their whole plant."

The appellants insist that the petition should have been dismissed because it was not properly brought under the

Burnt Record act, for the reason that it was not shown that any of the muniments of the petitioner's title were destroyed by the fire of October 9, 1871. In *Gage* v. *Gentzel,* 144 Ill. 450, the same contention was made, that although the evidence disclosed that the public records were destroyed it also appeared that all the title deeds alleged in the petition to have been destroyed were, in fact, in existence and were produced as evidence upon the hearing, and that there was, therefore, no reason for proceeding under the Burnt Record act; but the court held that it was not necessary to allege or prove the destruction of the evidences of the chain of title, but only "that the records, or any material part thereof, * * * had been destroyed by fire or otherwise so that a connected chain of title could not be deduced therefrom." The court in such cases is required to decree, not what the records showed before they were destroyed but in whom the title is vested. It is therefore competent to show a perfect possessory title without making any proof of the title previous to the possession, and such possessory title is sufficient in the absence of a paramount title. (*Robinson* v. *Ferguson,* 78 Ill. 538.) The effect of the Burnt Record act was to enlarge the jurisdiction of courts of equity, and proceedings to establish title under that act are chancery proceedings and the rules and regulations governing courts of chancery in this State are applicable to them. (*Gage* v. *DuPuy,* 127 Ill. 216; *Rogers* v. *Tyley,* 144 id. 652.) The destruction of records in a chain of title gives a court of chancery jurisdiction, on petition, to inquire into and establish title, and having so acquired jurisdiction it may remove a cloud from the title in the same suit. *Gage* v. *Harbert,* 145 Ill. 530; *South Chicago Brewing Co.* v. *Taylor,* 205 id. 132.

The petitioner showed a connected chain of title from the United States to the southwest quarter of section 14, which included much the greater part of the land in controversy, but there was a narrow strip of the northwest

quarter of section 23 adjoining the southwest quarter of section 14 the title of which is derived through a receipt of John H. Kinzie, receiver of the United States, to George H. Rumsey for the entry of the northwest fractional quarter of section 23, dated January 20, 1853, and recorded July 8, 1870. The appellants contend that such a receipt is not evidence of title and the court erred in admitting it in evidence. It was held in *Roper* v. *Clabaugh*, 3 Scam. 166, that a receiver's certificate of payment for land is not evidence of title in the person paying the money. That was an action of trespass *quare clausum fregit* for an entry on the plaintiff's close and carrying away his rails and other property, in which it was necessary for the plaintiff to prove that he was the owner of the legal title to the land trespassed on. The statute made the certificate of any register or receiver of any land office of the United States to any fact or matter on record in his office competent evidence to prove the fact certified and the certificate of any register of the entry or purchase of any tract of land within his district evidence of title in the person making such entry or purchase. The certificate of the receiver was therefore incompetent to prove the legal title in Rumsey. It is a general rule in respect to the sales of real estate that when a purchaser has paid the full purchase price his equitable rights are complete and there is nothing left in the vendor but the naked legal title, which he holds in trust for the purchaser. This general rule of real estate law has been repeatedly applied by the Supreme Court of the United States to the administration of the affairs of the land department of the government, and the rule has been uniform that whenever, in cash sales, the price has been paid, or, in other cases, all the conditions of entry performed, the full equitable title has passed and only the naked legal title remains in the government in trust for the other party, in whom are vested all the rights and obligations of ownership. (*Benson Mining Co.* v. *Alta Mining Co.* 145 U. S. 428.) The

receipt is an acknowledgment by the government that it has received full pay for the land and that it holds the legal title in trust for the entryman and will in due course issue to him a patent. He is the equitable owner of the land. It becomes subject to State taxation and under the control of State laws in respect to conveyances, inheritances, etc. (*United States* v. *Detroit Timber and Lumber Co.* 200 U. S. 321.) This is a suit in equity. The petitioner seeks to remove a cloud upon its title. By the receipt in evidence Rumsey became entitled to a patent and became the equitable owner of the land. It has been since subject to State taxation and under the control of State laws in respect to conveyances, inheritances, etc. The petitioner, as his remote grantee, has succeeded to this equitable title. The court had authority to determine and establish the title or interest of the petitioner, legal or equitable, against all persons, known or unknown, and all liens existing on the land, whether by statute, judgment, mortgage, deed of trust or otherwise. The receipt was properly received in evidence.

The petitioner and cross-petitioner having proved a title, whether legal or equitable, from the United States, the presumption must prevail in favor of the validity of their titles and in favor of possession accordingly until overcome by evidence to the contrary. The burden of producing such contrary evidence rests on the appellants. The presumption of the law is that the possession of real estate is subservient to the rights of the owner of the record title, and, where the possession has been consistent with his title, nothing but a clear, unequivocal and notorious disclaimer and disavowal of the title of the owner will render the possession, however long continued, adverse to him. Possession having been acquired in subserviency to the owner of the fee, a clear and positive assertion of an adverse right definitely brought to the knowledge of the owner must be shown before any foundation can be laid for the operation of the statute. (*Thompson* v. *Toledo, St. Louis and Western Railroad Co.*

271 Ill. 11; *Kirby* v. *Kirby*, 236 id. 255; *Andrews* v. *Floyd*, 308 id. 559; *Jaster* v. *Spikings*, 312 id. 170; *Branch* v. *Central Trust Co.* 320 id. 432.) Adverse possession cannot be made out by inference or implication, for the presumptions are all in favor of the true owner, and the proof to establish it must be strict, clear, positive and unequivocal. (*McClellan* v. *Kellogg*, 17 Ill. 498; *Zirngibl* v. *Calumet Dock Co.* 157 id. 430; *White* v. *Harris*, 206 id. 584; *Jones* v. *Scott*, 314 id. 118; *Schmitt* v. *King*, 316 id. 239.) The settled law announced in *Zirngibl* v. *Calumet Dock Co.* *supra,* and in many other decisions both before and since, is: "The adverse possession which is required to constitute a bar to the assertion of a legal title by the owner of it must include these five elements: It must be (1) hostile or adverse, (2) actual, (3) visible, notorious and exclusive, (4) continuous, and (5) under a claim or color of title." Disregarding the other three of these elements, it is manifest that the appellants have wholly failed to establish the first and the third elements by the strict, clear, positive and unequivocal proof required by law. "A party claiming title by adverse possession always claims in derogation of the right of the real owner. He admits that the legal title is in another. He rests his claim not upon a title in himself as the true owner but upon holding adversely to the true owner for the period prescribed by the Statute of Limitations. Claiming a benefit from his own wrong, his acts are to be construed strictly." *Cornelius* v. *Giberson,* 25 N. J. L. (1 Dutch.) 1, 31.

It is unnecessary to repeat the evidence which we have set out at perhaps needless length. Our conclusions from it are that Annie Fraser and her husband, Edward Fraser, took up their residence in the boat house on Athletic Island by permission of the petitioner's predecessor, the Pullman Company, without any written agreement, and the evidence does not show upon what consideration, if any. They lived there for two or three years and Annie had an ice cream

stand under the grand-stand there two summers. It does not appear upon what terms she was occupying the house, but the presumption of law, which is always in favor of the real owner, is that her possession was subservient to the owner's title, in the absence of evidence to the contrary. A part of the time her husband was employed by the Pullman Company and part of the time at Harvey, but she testified that he had no duty in connection with the boat house and was not a caretaker at any time after they moved there. We do not believe that of her own motion, without any permission from anybody, she moved into the boat house on Athletic Island and occupied it for two or three years without paying any rent or having any agreement with the owner, which was well known and through its agents accessible. Unusual as such a transaction may appear, its occurrence is physically possible, and we might have accepted Mrs. Sabbe's account of it but for her narrative of the circumstances of the transportation of the boat house from its site on Athletic Island across the channel to the new location and of her possession of it on the other side. In view of the unusual and unnatural character of the undertaking as narrated by Mrs. Sabbe (the removal of a house to which she had no title and made no claim of ownership, without the consent or knowledge of the owner, at an expense of $225, across a water channel to another location 200 feet away, to which she also had no title or claim or ownership, the removal occupying eight or ten days, and repairing, re-building and making additions to the house, all without objection by the owner, in view of the other testimony that the removal and re-location were made by the permission of the owner, that a lease for not exceeding an acre of ground as the new location for the boat house was entered into by Mrs. Fraser's husband with her knowledge, that she and her husband occupied the premises and lived together there in harmony until his death, in 1914, and in view of the evidence of the payment of rent on the

lease by the husband with the wife's knowledge and approval,) we cannot accept her version of the facts as sustained by the preponderance of the evidence, much less as constituting the strict, clear, positive and unequivocal proof required of the appellants on this issue.

Neither does the evidence show the possession of Mrs. Fraser to have fulfilled the requirement of the third element—that the possession must have been visible, notorious and exclusive. Neither Edward Fraser nor Annie Fraser had any title to the premises. They were husband and wife, living together in that relation, when they jointly entered upon the possession of the property. Unless they made the entry by permission of the owner, as, in our judgment, they did, they were joint trespassers. The appellant Annie now claims the benefit of an exclusive possession, but that claim cannot be sustained. Where the wife owns the fee of homestead property she may be so far considered the head of the family as to be regarded as a householder, but where she has no title and they are in possession without right her possession is simply subordinate to her husband's and his admission of ownership in the holder of the paramount title is an admission which binds her. "Where the husband is the head of the family, as he is in the eye of the law, his taking a lease of the property is binding upon her, so far as it operates as a recognition of the title of the true owner." (*Chicago and Alton Railroad Co.* v. *Keegan,* 185 Ill. 70.) Whether or not Mrs. Fraser had consented to or had knowledge of her husband's acceptance of the lease from the Pullman Company, she was bound by the admission of the lessor's title implied by such acceptance and could not assert a hostile title until after actual surrender of possession to the lessor.

The decree of the circuit court was right. It is affirmed.

*Decree affirmed.*